Filed 4/10/18 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>TURLOCK HERNAN DIAZ et al.,<br><br>    Defendants and Appellants. | F071348<br><br>(Super. Ct. No. 1423449)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on March 20, 2018, be modified in the following particulars:

1.  In a published portion of the opinion, the paragraph commencing at the bottom of page 2 with "In the published portion" and ending at the top of page 3 with "discussed in this opinion" is modified to read as follows:

> In the published portion of this opinion, we hold that Diaz's conviction on count II need not be vacated as a lesser included offense of felony murder as charged in count I. In the unpublished portion, we hold: (1) The trial court did not err by refusing to bifurcate the gang enhancements; (2) Any error in the admission of gang-related evidence was harmless; (3) The trial court was not required to give CALCRIM No. 375 on its own motion regarding Pantoja's prior offenses; (4) Neither defendant is entitled to reversal based on a theory of cumulative prejudice or of ineffective assistance of counsel; (5) Diaz is entitled to have his case remanded to the juvenile court for a transfer hearing; (6) Whatever the outcome of the transfer hearing, the court must exercise discretion whether to strike the section 12022.53 enhancement as to Diaz, but Diaz is not entitled to have the enhancement stricken or its imposition barred;

(7) Diaz's argument, that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, is moot, but, if his case remains in a court of criminal jurisdiction, he is entitled to a limited remand pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*); (8) In light of recent statutory amendments, Pantoja is entitled to a limited remand pursuant to *Franklin*; and (9) Clerical errors in both defendants' abstracts of judgment must be corrected. Accordingly, we affirm Pantoja's judgment in its entirety, but remand for the limited purpose of affording him the opportunity to make a record of information relevant to his eventual youth offender parole hearing. As to Diaz, we conditionally reverse his convictions and sentence and remand for further proceedings, as discussed in this opinion.

2.      On page 89, in an unpublished portion of the opinion, the last sentence of the first full paragraph, the name "Diaz" is changed to the words "both defendants" and the word "him" is changed to the word "them" so that the sentence reads:

> We also conclude, however, that both defendants should receive a limited remand to afford them an adequate opportunity to make a record of information that will be relevant to the parole authority as it fulfills its statutory obligations under those statutes.

3.      On page 92, in an unpublished portion of the opinion, following the first full paragraph and prior to the subheading "**C.   Clerical Errors in the Abstracts of Judgment**" the following paragraphs are added:

> At the time Pantoja was sentenced, he was not entitled to a youth offender parole hearing, as such hearings were limited to juvenile offenders who committed their controlling offenses before age 18. (§ 3051, former subd. (b)(3).) Pantoja was 18 years old at the time of the offenses in this case. Subsequently, the Legislature amended subdivision (b)(3) of section 3051 to require youth offender parole hearings for offenders who committed their controlling offenses before, first, age 23 (stats. 2015, ch. 471, § 1, eff. Jan. 1, 2016) and, most recently, age 25 (stats. 2017, ch. 675, § 1, eff. Jan. 1, 2018).
>
> Because of the state of the law when Pantoja was sentenced, there was no mention of youthfulness at his sentencing hearing. In light of the recent statutory amendments, however, he is now entitled to the opportunity to make a record of information that will be relevant to his eventual youth offender parole hearing. (See *Franklin*, *supra*, 63 Cal.4th at p. 284.) We will remand his matter for that limited purpose.

4.  On page 92, in an unpublished portion of the opinion, following the now third full paragraph, after the sentencing ending "for that limited purpose" add as footnote 71 the following footnote:

> **71** Pantoja raised this issue in a petition for rehearing. We directed the Attorney General to respond. The Attorney General agreed Pantoja is entitled to a *Franklin* hearing, and expressly stated the People have no objection to a limited remand for that purpose. As a result, we conclude a modification of our opinion to so provide adequately resolves the issue, without the need for rehearing.

5.  In the published disposition, the paragraph commencing at the bottom of page 93 with "As to Pantoja" and ending at the top of page 94 with "to the appropriate authorities" is modified to read as follows:

> As to Pantoja, the judgment is affirmed in its entirety. The matter is remanded to the trial court for the limited purpose of affording Pantoja an adequate opportunity to make a record of information that will be relevant to the parole authority as it fulfills its statutory obligations under Penal Code sections 3051 and 4801, subdivision (c). The trial court shall cause to be prepared an amended abstract of judgment that reflects that liability for victim restitution is joint and several, and that conviction on count II was by jury, and shall cause a certified copy thereof to be transmitted to the appropriate authorities.

This modification changes the judgment.

Appellant Pantoja's petition for rehearing is denied.

DETJEN, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

PEÑA, J.

3.

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TURLOCK HERNAN DIAZ et al.,<br><br>    Defendants and Appellants. | F071348<br><br>(Super. Ct. No. 1423449)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Scott T. Steffen, Judge.

Kurt David Hermansen, under appointment by the Court of Appeal, for Defendant and Appellant Turlock Hernan Diaz.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Pantoja.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part IV of the Discussion and the Disposition are certified for publication.

**INTRODUCTION**

Turlock Hernan Diaz and Daniel Pantoja (Diaz and Pantoja, respectively; collectively, defendants) were charged, together with J.P., with murder (Pen. Code,[1] § 187, subd. (a); count I) and attempted carjacking (§§ 215, subd. (a), 664; count II). As to both counts, it was alleged the crime was committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that a principal personally and intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)).

Pantoja's motion to sever trials was granted, and dual juries were empaneled, one for Pantoja's trial and the other for the trial of Diaz and J.P. J.P. was acquitted. As to count I, Diaz was convicted of first degree murder committed during the commission of an attempted carjacking.[2] As to count II, Diaz was convicted of attempted carjacking. The jury found the gang enhancement allegation not true, but the firearm discharge allegation true. Pantoja was similarly convicted on counts I and II, but his jury was unable to reach a unanimous finding on the enhancement allegations. Those allegations subsequently were dismissed on the prosecutor's motion. Defendants' motions for a new trial were denied, and they were sentenced to lengthy prison terms.

In the published portion of this opinion, we hold that Diaz's conviction on count II need not be vacated as a lesser included offense of felony murder as charged in count I. In the unpublished portion, we hold: (1) The trial court did not err by refusing to bifurcate the gang enhancements; (2) Any error in the admission of gang-related evidence was harmless; (3) The trial court was not required to give CALCRIM No. 375 on its own motion regarding Pantoja's prior offenses; (4) Neither defendant is entitled to reversal

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

[2]    The jury apparently was not asked to make findings on the firearm and gang enhancement allegations.

based on a theory of cumulative prejudice or of ineffective assistance of counsel; (5) Diaz is entitled to have his case remanded to the juvenile court for a transfer hearing; (6) Whatever the outcome of the transfer hearing, the court must exercise discretion whether to strike the section 12022.53 enhancement as to Diaz, but Diaz is not entitled to have the enhancement stricken or its imposition barred; (7) Diaz's argument, that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, is moot, but, if his case remains in a court of criminal jurisdiction, he is entitled to a limited remand pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*); and (8) Clerical errors in both defendants' abstracts of judgment must be corrected.  Accordingly, we affirm Pantoja's judgment in its entirety.  As to Diaz, we conditionally reverse his convictions and sentence and remand for further proceedings, as discussed in this opinion.

## I[*]

### PROSECUTION EVIDENCE

### *Evidence Presented to Both Juries*

#### *Events Surrounding Charged Offenses*

Around 4:00 p.m. on August 4, 2010,[3] Kellie Sample, Pantoja's mother, saw defendants and J.P. together at her house.  She estimated the trio left the house shortly before dark.

Between 10:30 and 11:00 p.m. on August 4, Timothy Gilpin and Derek Patteson left Gilpin's house in Riverbank to walk a female friend home.  The woman lived past the ampm minimart that was located at the corner of Oakdale Road and Patterson Road.  Ampm was three-quarters of a mile to a mile from Gilpin's house.  Star Market, on

---

[*]     See footnote, *ante*, page 1.

[3]     Unspecified dates in the statement of facts are to the year 2010.

Patterson Road, was about half a mile from ampm. Galaxy Theatres was between Star Market and ampm.

As the trio was passing Galaxy Theatres, Gilpin saw three people, who appeared to be males, on the corner about a block away. They were wearing white shirts. Patteson went over to them, then returned and said he was going to buy the three some alcohol and make some money. Gilpin took the woman the rest of the way to her home.

Shortly before 11:00 p.m., Patteson entered Star Market, followed by J.P. and defendants. The store's surveillance video (which was shown to both juries) revealed that J.P. was wearing jeans and a dark shirt and cap, while defendants were wearing white shirts and dark caps. Defendants also were wearing crucifixes with red on them. Defendants looked at some items in the store, and fingerprint analysis showed defendants handled a small package of cigars on the counter. J.P. purchased a bag of chips. Patteson purchased two beverage cans.

Meanwhile, Gilpin headed home after dropping the woman off at her house. As he passed through the parking lot behind Galaxy Theatres around 11:00 p.m. or shortly after, he saw defendants and J.P. jump the fence into the parking lot. One loudly yelled "West Side" and "Norte[ñ]o."[4] Gilpin passed them, then turned and looked over his shoulder. The three were walking in the direction of ampm.

David Gomez, who drove a Honda Accord, got off work at midnight. As he was driving home, he saw his friend, Chaz Bettencourt. Gomez asked if Bettencourt wanted to go to ampm with him. Bettencourt got into the passenger seat of the car, and they drove to ampm. This was around 12:35 a.m. on August 5.

Gomez parked on the left side of the store, in front of the door. While he was getting his money together, Bettencourt got out of the car and went inside. As Gomez

---

**4** When Gilpin spoke to Deputy Humble about what he had seen and heard, he said he heard "Norteño," but thought he might also have heard "Sure[ñ]o." His best recollection at trial was that he might have heard both.

4.

exited the vehicle, he noticed three males walking toward him from the direction of the gas pumps. Gomez glanced at them, then went inside the store.[5]

As Gomez walked in, Bettencourt was already at the register, either purchasing something or talking to the clerk. Gomez, who intended to buy iced tea, noticed the three males were leaning against the store windows, right in front of his car. As Gomez made his purchase, Bettencourt walked outside and waited by the passenger door of the car.

As Gomez exited ampm, one of the three — Diaz — acted like he was walking away from the store toward the gas pumps. He then came behind Gomez, pointed a gun in his face, and started demanding the keys to the car.[6] Diaz said, "Give me your fucking keys. I will blast you." When Gomez looked at the gun, Diaz racked the slide back, cocking the gun, and said in an intimidating tone of voice, "This is real." The other two — Pantoja and J.P. — were still standing in front of the car.

Gomez, who was afraid, started backing up with his hands up, although he did not turn over his keys. He was focused on the gun and did not know what Pantoja and J.P. were doing at that point. Gomez backed up toward the trunk of his car, then around the trunk and toward the passenger side front. Diaz followed with the gun pointed at Gomez's face. Gomez did not know where Bettencourt was and did not hear him say anything. Gomez was still focused on the gun. Diaz stayed by the hood of the car, and did not follow Gomez once Gomez moved to where there were security cameras and lights.

---

[5] Store surveillance video was shown to both juries. It showed defendants and J.P. walking across the parking lot toward the store. There was nothing about their gait to indicate they were heavily intoxicated.

[6] Store surveillance video showed Diaz pointing the gun toward the back of Gomez's head and then his face. Diaz showed no signs of heavy intoxication. Gomez did not smell any liquor on Diaz's breath. Diaz was not stumbling and his speech was not impaired.

Gomez wanted to make his way toward the front doors of ampm. As he backed toward the front door of the store, J.P. came from behind and started blocking him, using his body to push Gomez away from the doors. J.P. told Gomez that he "need[ed] to go back over there," toward the bathrooms, where it was very dark and there were no security cameras. J.P. said he had a gun.[7] Although he never displayed a firearm, J.P. reached down into his pocket and shook it around, as if he was going to pull out a gun. Gomez did not know where Pantoja was at this time. Gomez tried to get past J.P.. Their bodies were in contact for about 15 seconds.

J.P. moved out of the way and went back toward Gomez's car. Gomez got inside ampm and told the clerk to call 911, and that the assailants had a gun. About 10 to 15 seconds later, he heard two gunshots. They sounded like they came from the direction of his car. Gomez could see his car, but did not see any bodies.

M.C. was pulling up to the gas pumps when she saw "a few guys" on the side of a car parked in front of the store. One shot the other one twice from several feet away. This happened near the rear of the car. Other young men (M.C. was not sure how many) were standing near the front of the car. The one who was shot ran toward the gas pumps and fell. "[A] bunch of kids" ran on the other side of the store. They wore baggy clothes and looked "thug-ish." M.C. was in shock and did not know what to do, so she just left.

Gomez stayed inside the store for another 20 to 25 seconds, but did not see anyone. When he went outside, he found Bettencourt lying on his back some distance from Gomez's car. Defendants and J.P. were gone.

At approximately 12:45 a.m. on August 5, Stanislaus County Sheriff's Deputy Moss was on patrol in Riverbank when he was dispatched to the ampm store. When he drove into the parking lot, he saw Bettencourt, lying on his back. Gomez was standing

---

**7**    Gomez did not smell any liquor on J.P.'s breath. J.P. did not stagger or slur his words.

6.

over him.  Bettencourt was alive but unresponsive.  He had sustained two gunshot wounds to the chest.  He subsequently died from his injuries.

Gomez's silver Honda was parked to the west of the front door of ampm.  In each of the two parking spaces to the west of the Honda was a black cloth shoe.  A spent .22-caliber shell casing was found west of the front door of the market.  A black shoe was found south of ampm, in the parking lot for other businesses.  A small, semiautomatic, .22-caliber handgun, with the serial number scratched off, was found lying in the dirt near bushes about 100 yards south of ampm.[8]  There was an expended shell casing still in the chamber.  It appeared the gun had jammed.  Next to the gun was a .22-caliber magazine that contained eight rounds of ammunition.  Two bullets were recovered from Bettencourt's body.  One had rifling characteristics similar to bullets that were test-fired from the gun recovered at the scene, although a conclusive determination could not be made.  The other recovered bullet was too heavily damaged for comparison.  The expended cartridges were determined to have been fired in the pistol.

Gilpin learned of the shooting when he woke on the morning of August 5.  Wondering if the three individuals he had seen walking toward ampm were involved, he sought out Patteson and learned Patteson had purchased Four Loko for them.  Gilpin then went to the back of the Rio Altura schoolyard, where he had seen the three jump the fence between the schoolyard and the Galaxy Theatres lot, and found a Four Loko malt beverage can.  He left it there and notified the sheriff's department.[9]  Defendants' DNA was found on the can, which was 23.5 ounces in size.

---

[8]    At trial, Gomez identified this gun as the one Diaz pointed at him.

[9]    Gilpin spoke to Deputy Bennett, who seized the empty can.  Gilpin told Bennett that he had seen three subjects climbing over the fence from the school side into the theater parking lot.  Gilpin described them as being two Hispanics and one Black person.  He said they were throwing gang signs and shouting "Norte," and they threatened to "kick [his] ass."  Gilpin told Bennett one was holding a can of "Four Clowns" beer, which he threw over the fence into the yard of the school.

7.

On August 6, Gomez was shown two photographic lineups. Gomez immediately identified a photograph of Diaz and said he was the person holding the gun. Gomez was unable to recognize anyone in the lineup containing Pantoja's photograph. After J.P. turned himself in on August 12, a photographic lineup containing his picture was shown to Gomez. Gomez was unable to identify J.P.

Stanislaus County Sheriff's Detective Hatfield interviewed Kellie Sample on August 6. Defendants and J.P. returned to her house on August 5, while it was still dark. At Pantoja's request, she drove them to Diaz's home in Turlock. She told Hatfield about a phone conversation she had with Pantoja when he was at the Turlock house. Kellie Sample said she overheard Diaz's mother ask something like, "Why did you point the gun at him and shoot him for?" Diaz replied, "That's what you do when you point a gun at someone, isn't it?" Kellie Sample also told Hatfield that prior to the shooting, she heard Diaz ask Pantoja if he "had the piece." She said she did not see any type of gun, however.[10]

### Gang Evidence[11]

On the evening of July 22, Stanislaus County Sheriff's Deputy Albers was on patrol at the Stanislaus County Fair, at the fairgrounds in Turlock. Albers saw Diaz walking through the crowd on the midway, holding his hand above his head. Diaz had made a "W" with his fingers and was moving it back and forth. Pantoja and J.P. were "flanking" him. Diaz was wearing a white T-shirt, black jeans, and red and black shoes. Pantoja was wearing a white shirt, black jeans, and red and white shoes. J.P. was

---

[10] At trial, Kellie Sample denied hearing any conversation about a firearm among defendants and J.P. She also testified she did not recall hearing anything in the background during her cell phone conversation with Pantoja.

[11] Although jurors did not return true findings on the gang enhancements as to either defendant, we summarize the evidence adduced at trial in some detail in light of the issues raised on appeal.

wearing a black hat, black shirt, and blue jeans. Because Albers perceived the hand sign to be gang related, the group was told to leave the fair.

Diaz's residence, which was in Turlock, was searched on the evening of August 6. During the search, Stanislaus County Sheriff's Sergeant McQueary made contact with Adrian Hernandez, who identified himself as Diaz's biological father. Hernandez did not live at the residence being searched. Hernandez had visible tattoos, including a Huelga bird on his hand, the numbers one and four, and "West Side" on his inner arms.

Corporal Berry of the Redding Police Department had years of experience with gangs, including the Sureño and Norteño gangs.[12] From 2010 to 2012, he worked with Robert Marquez, a nationally recognized gang expert employed by the California Department of Corrections and Rehabilitation (CDCR) in the Special Services Unit (SSU). SSU agents investigate gang-related activities within CDCR. Marquez taught Berry about the Nuestra Familia, the Nuestra Familia Raza, and street-level Norteño gangs.

On June 6, Berry investigated a beating that took place inside a Circle K market in Redding. In the course of his investigation, he viewed the Circle K videotape that captured the attack. The incident appeared to be gang related. Berry spoke with the victim, who said he was a Sureño gang member, although he was no longer active. Berry learned that a drive-by shooting was reported about an hour and a half after the incident that took place inside Circle K. The suspect vehicle was the same vehicle that the video showed parked in front of Circle K, in which the suspects arrived and departed. The beating victim said the drive-by shooting was perpetrated by the same people in the same vehicle.

Berry determined the vehicle was registered to Jacinto Valdovino, a documented Norteño gang member. Upon speaking to Marquez and other investigators, Berry

---

**12** Berry testified as one of the prosecution's gang experts.

ascertained Valdovino was a regimental commander and part of Nuestra Raza, which was a step up from a street-level Norteño gang although not as high up as the Nuestra Familia. Berry and other investigators received information Valdovino was sent to the Shasta County area with directions to establish a Norteño regiment in that area.

Based on his investigation of the Circle K incident, Berry identified Pantoja and Justin Plympton as suspects. Plympton was a documented Norteño. Berry accessed a MySpace page attributable to Pantoja. It contained a link to the Circle K beating surveillance video. The comment underneath read, "Me and a homie fuck a scrap."

On September 13, defendants were located inside the Redding residence of Manuel Ortiz, a known gang member. Berry subsequently filled out a Redding Police Department Gang Criteria Report. A point system is used to determine whether someone fitting the listed criteria is a documented gang member. Ten points are required. Pantoja received 29 points. Berry also interviewed Pantoja after advising him of his constitutional rights. Pantoja admitted he was shown in the video of the Circle K beating. When Berry asked why he engaged in the beating, Pantoja said something about the victim having talked to his girlfriend. He also said that when he first went to Redding, he had met the victim and did not like him. When Berry asked if it was because he was a "scrap," Pantoja chuckled and said, "Yeah, that, too."

Froilan Mariscal, who testified as an expert on criminal street gangs, was employed both by the Stanislaus County District Attorney's Office and by the Federal Bureau of Investigation (FBI) on its Central Valley Gang Impact Task Force. He grew up in Modesto, and had his first exposure to gangs — including Norteño gangs and their rivals — when he was in junior high school. As a police officer, detective, and then investigator and member of the FBI's gang task force, he received extensive training and experience in gangs and gang crimes. He also provided training to various law enforcement agencies pertaining to criminal street gangs, as well as providing training to nonlaw enforcement agencies such as schools.

Mariscal uses 12 criteria to document someone as a gang member. The person must meet at least two points to be documented, although even then, Mariscal applies his experience and training in deciding whether someone is a gang member. Although J.P. met four criteria, Mariscal opined he was an associate and not a gang member. Mariscal had experience with a nongang member joining with validated gang members to commit a crime. In such instances, trust is vital. In order for someone to be allowed to participate with gang members in any crime, that individual must have the trust of the gang members.

Mariscal described the organization of the Norteño gang as "very structured." A gang member told him to think of the organization as being like a tree. The roots and trunk are the Nuestra Familia prison gang, the branches are the Norteños, and the leaves are the Northerners. Although they might have different functions, they are part of the same organization and are the same gang.[13] All three claim the color red and the number 14. The gang operates by splitting the state into different geographical regions or areas, each of which is controlled by a regiment commander. Underneath the individual in charge of, for example, Stanislaus County, are individuals who are in charge of each city in the county. Underneath them are members that are participating directly under the direction of the city leader. Above the Stanislaus County regiment commander is someone in Pelican Bay State Prison or another state prison who controls the activities of the county. Information flows from street-level Northerners to the Nuestra Familia in

---

[13]   Mariscal distinguished between Norteños and Northerners, in that "Norteño" is a term used for someone with more status within the gang, while "Northerner" is used for someone who has less status or less occasion being in the gang. Gang members use the terms synonymously, however, and may identify themselves as Northerners on some occasions and as Norteños on others. Mariscal explained that the law does not differentiate between an associate and a member of a gang, but rather refers to an active participant.

prison.**14**  The Norteño gang has a written set of rules called the 14 Bonds.  They were handed down from the Nuestra Familia prison gang to the Norteños to follow.**15**  The 14 Bonds are enforced by Norteño gang members.**16**

The Norteño gang has subsets, which tend to be smaller groups within a city.  Usually, they are based in a neighborhood and control that geographical area.  All claim the same color and number.  One of the subsets in Turlock is the West Side Turlock Norteños.  When someone from that subset waves the W sign back and forth in a crowd, he is publically announcing his allegiance to the neighborhood subset.  Similarly, if a gang member associated with Turlock is found in Riverbank, yelling "West Side," he is claiming his allegiance to the neighborhood subset of which he is a part.  The concept of allegiance to the gang is bigger than just allegiance to a subset, however.  In 1997 or 1998, the Nuestra Familia prison gang at Pelican Bay State Prison ordered a stop to all infighting between neighborhoods of Norteños.  There was a "big push" for all Norteños to unite and to become loyal to the Norteño organization as a whole and not to fight

---

**14**     Mariscal investigated a case in which an informant, who was one of the commanders in Stanislaus County, was ordered by the Nuestra Familia to have direct communication with one of the gang leaders at Pelican Bay State Prison.  The information and direction the informant was obtaining from his commander in the county was coming directly from the prison.

**15**     Mariscal worked with an informant who worked directly for the Nuestra Familia prison gang.  This person had been tasked as an educator for all the gang members on the streets.  He personally wrote out the bonds — the rules of the gang — for Mariscal.

**16**     One of the bonds says a gang member is not to desert a fellow gang member in time of struggle or war.  Mariscal investigated a case from Turlock in which two active Norteño gang members were in a fight with a dropout gang member who was now an enemy of the active members.  Another active member who was present came to the aid of the dropout.  Because of that, the two active members later killed the person who came to the dropout's aid.

Mariscal did not know whether defendants and J.P. were ever taught about the 14 Bonds.

12.

among each other within neighborhoods. Mariscal acknowledged, however, that sometimes the rules were broken and Norteño gangs fought with other Norteño gangs.

Mariscal explained that it is important for gang members and associates to prove themselves to the gang. To prove oneself to the gang, a person must commit violent acts to show the gang can use him for the gang's advancement. Gang members and gangs rely on the commission of violent acts to enhance the gang's reputation. A gang cannot survive or thrive without the violent reputation it needs to control its members, its rivals, and neighborhoods. For instance, when a gang leader orders squad members to do something, one of the reasons the orders are carried out is because the squad members fear retaliation by their own gang if the orders are not carried out.[17] In terms of controlling neighborhoods, people will refuse to cooperate with law enforcement after violent crimes are committed because of fear of retaliation by the gang.

According to Mariscal, one of the main goals of the Norteños is to make money. They do this, for the most part, by dealing drugs and committing robberies. If, for instance, the gang wants to establish a stronghold in a neighborhood and control the drug trade there, and a rival is currently selling drugs in the neighborhood, the gang will approach that person and order him either to stop selling drugs in the gang's territory or to pay a tax to the gang. The violent reputation of the gang allows it to exercise that control.[18]

---

[17] Mariscal spoke to numerous individuals who said they had to partake in a robbery because they were ordered to do it, and had they not done it, they or their family would have been killed.

[18] Mariscal was part of an investigation in which the gang wanted to control a neighborhood in Modesto for the drug trade. A rival gang member was selling drugs in the neighborhood. They approached him and told him that he could not sell drugs in their neighborhood. When he did not comply, an order was issued to kill him. The gang carried out the order. They shot the individual, who survived, and killed his son and his friend.

13.

In Mariscal's experience, if a gang member allows himself to be disrespected and he does not respond with (usually) violence, he loses credibility in the eyes of rival gang members and is perceived as weak. When someone is perceived as weak within the gang, he is not meeting the standard of what the gang needs in order to thrive. If the target of a Norteño's intended crime refuses to comply with the gang's demands, it is considered an act of disrespect.

In Mariscal's experience, the Norteño gang is a predatory gang. He investigated numerous crimes in which gang members in groups committed violent acts against outnumbered individuals. He acknowledged, however, that a gang member could commit a crime that was completely independent of the gang. He could not say that someone ordered what happened at ampm. There was no evidence anybody ordered the shooting.

Mariscal estimated there were 4,000 documented Norteño members and associates in Stanislaus County in August. The Norteño gang is the predominant gang in the county. Mariscal often personally investigated violent crimes committed by Norteño gang members. Based on those investigations, which involved violent crimes such as murders, attempted murders, shootings, stabbings, and beatings, he knew the gang to be involved in violent crime and to rely on violent crime to enhance its reputation and its mission. Based on his personal investigations, he opined that the primary activities of the Norteño gang in Stanislaus County included murders, attempted murders, felony assaults, drive-by shootings, drug-related offenses, robberies, and auto thefts.

During his almost 10 years as a gang investigator in Stanislaus County, Mariscal had seen the color red displayed in a variety of ways. These included wearing a red hat, red belt, red shoes, red bandanas, red earrings, red rubber bands in the hair, and red necklaces. Representing the color is important to the Norteño gang, as it is one way in which gang members can identify each other, can find unity, and can identify themselves to rival gang members. It is also a way of showing allegiance to the gang.

14.

Mariscal had found that Norteño gang members in Stanislaus County boast or brag about their criminal activity. Boasting and bragging relates to the fear and intimidation upon which the gang relies. If a gang member commits a crime by himself and nobody knows about it, it does nothing to enhance the gang's violent reputation. If a gang member commits a crime with individuals who report the crime to other gang members, the gang's violent reputation is enhanced.

Mariscal found the MySpace page associated with Pantoja to have numerous references to Norteños.[19] These included lines through the letter S; the use of the color red; the words "Norte," "Norteños," and "North Side"; the number 14; the use of the Huelga bird symbol[20]; and the use of the term "scrap," which is a derogatory term Norteños use toward southern gang members. The fact "scrap" was used, on a public web page, with the S crossed out in a symbol of disrespect, led Mariscal to believe the individual was bragging about a violent act committed upon a rival gang member.

Mariscal conducted a gang investigation of J.P. In an incident in Turlock that occurred on August 15, 2008, J.P. and one of his friends took a wallet from a girl. The friend said he was going to get gang members to beat her up. A juvenile petition for misdemeanor grand theft from the person was sustained as to J.P. as a result of the incident. In an incident that occurred on March 12 in Turlock, J.P. was contacted at night with three other individuals, one of whom was a documented Norteño gang member who was wearing almost all red clothing and who appeared in Mariscal's gang reports as also being associated with Diaz. One of the individuals was armed with a knife. Another incident occurred on May 28. J.P. was contacted at a park in Turlock that was known for

[19]     Based on the content of messages sent to and from the page, as well as subscriber information obtained from MySpace in response to a search warrant, Mariscal believed Pantoja created this MySpace page.

[20]     A Norteño must earn a tattoo of that symbol. If a person gets that tattoo on the street and goes to prison, he will be questioned about it and will likely have to commit an assault on someone to make him worthy of having that tattoo on his body.

gang activity. J.P. was in the company of two other individuals, one of whom he was with in the March 12 contact. J.P. was found to be in possession of marijuana. One of his companions had a BB gun down his pants. The final incident was the one at the fair.

Based on the foregoing incidents, J.P. met two of Mariscal's 12 criteria for being a gang member. Nevertheless, Mariscal opined he was not a gang member, but was an associate of the gang, and was trusted by the gang enough to be involved in a crime like the one for which he was on trial.[21]

Mariscal's investigation as to Pantoja revealed approximately 10 relevant incidents. The first occurred September 1, 2005. Pantoja, who was then 13 years old, was wearing red clothing when contacted by a Redding police officer. The next incident took place in Redding on December 10, 2005, when Pantoja again was contacted while wearing red clothing. On January 26, 2006, Pantoja was contacted at a high school in Redding, because he was on campus but was not a student there.[22] He was found to be in possession of marijuana for sale. He was wearing red shorts. Six days earlier, he was at the school after a large gang fight. The officer who contacted him had seen Pantoja wearing red and associating with gang members in the past.

The next incident took place on April 23, 2006, again in Redding. Pantoja and three other individuals were at the mall. Pantoja punched the victim and took his hat,

---

[21] Although the majority of Norteño gang members are of Hispanic descent, in Mariscal's experience, Norteños allow persons of other ethnicities to join their ranks. The inclusion of other races also applies within the prison system. Mariscal explained that he spent much of 2012 and part of 2013 investigating the activities of the Nuestra Familia prison gang and the Norteño gang on the streets in Stanislaus County. An African-American Norteño gang leader was working directly with the Nuestra Familia. This individual was operating as the overall leader for Modesto, and as the drug tax collector for the Nuestra Familia prison gang. At one point, he was recruited by a Nuestra Familia gang member to kill a fellow gang member who had failed to pay a drug debt.

[22] Pantoja's brother was a student at the school.

16.

which was red and white. Pantoja was arrested for robbery. He was in possession of a red bandana. On December 28, 2006, in Redding, Pantoja was contacted by an officer responding to a call of suspicious subjects looking into vehicles. Pantoja lied about his name. He was wearing red shorts and admitted being a Norteño. He was in the company of another self-admitted Norteño gang member. Pantoja was arrested for a curfew violation. On April 7, 2008, in Redding, officers responded to a call of a residential burglary. Pantoja and another male were wearing red shirts and dark pants. Pantoja led officers on a foot chase. When apprehended, he was carrying a backpack containing property (a bong and a gas mask) taken from the residence, and a piece of paper bearing Diaz's name and a telephone number. Pantoja admitted burglarizing the residence, associating with Norteños, and having a hatred of Sureños, but was not convicted or adjudicated in juvenile court as a result of the incident.

On September 16, 2008, Pantoja was arrested for auto theft after an officer saw him running from a stolen vehicle that had crashed on a freeway in Redding. Pantoja was wearing red sweatpants. The vehicle, which was stolen from Turlock, was a Honda. Pantoja was not convicted or adjudicated in juvenile court as a result of the incident. On March 17, 2009, Pantoja was contacted by Redding police who were conducting gang enforcement in an area known for gang activity. Pantoja, who was on probation and for whom warrants had been issued, ran with a male who was wearing red. When Pantoja was apprehended, he was with another individual who was wearing red and who was a documented Norteño gang member. The final incident, which occurred on June 6, was the Circle K incident involving Justin Plympton.[23]

---

[23] As of the time of trial, Pantoja had not yet been through the court system with respect to this incident.

17.

Pantoja met eight out of Mariscal's 12 criteria. Based on Mariscal's analysis and investigation of Pantoja, Mariscal opined Pantoja was an active Norteño gang member on August 5.[24]

Mariscal also reviewed incidents pertaining to Diaz. On May 1, Turlock police responded to a call of a stolen vehicle in an alley on the west side of Turlock. Upon arrival, Diaz and a documented Norteño gang member — one of the people contacted with J.P. on March 12 — admitted they had stolen the vehicle, a Honda. They admitted driving it around and pushing it into the alley, and starting to take off the tires and wheels. When booked at juvenile hall, Diaz admitted that he associated with Northerners and did not want to be housed with Sureños. A juvenile petition for vehicle theft was sustained as to Diaz as a result of this incident.[25] The other incident was the one at the fair. In addition, photographs and items recovered during the search of the Turlock residence associated with Diaz were consistent with the gang Diaz claimed.[26]

Mariscal also reviewed Diaz's school records. They showed a pattern of juvenile delinquent activity, which, Mariscal explained, is consistent with juveniles who are associated with gangs, although it could also be consistent with someone not so associated. There was a lot of violence such as fighting and threats, including one incident in which Diaz threatened to kill a student.

Diaz met six of Mariscal's 12 criteria. Based on everything Mariscal reviewed, Mariscal opined Diaz was an active Norteño gang member on August 5.

---

**24** According to Mariscal, Pantoja dropped out of the gang in February 2011.

**25** Although Diaz's coperpetrator had gang terms imposed as a condition of probation, no such terms were imposed on Diaz. When discussing the case with the probation officer tasked with preparing the dispositional report, Diaz denied gang membership or association.

**26** Mariscal did not know if Diaz was an occupant of the house, who else was staying there at the time of the search, or what, if anything, belonged to Diaz.

In response to a hypothetical question based on the prosecution's evidence concerning the charged offenses, Mariscal opined that the events benefited the Norteño gang. The wearing of gang colors and yelling out the gang's name in a public area was a public announcement of the presence of the gang and the individuals' allegiance to it; it is part of the fear and intimidation factor the gang instills in people its members encounter. The fear and intimidation factor is what the gang utilizes to thrive in "our" neighborhoods. The way the individuals confronted the men outside the car at ampm reinforced the rules of the gang that say a gang member is not to abandon a fellow gang member. Reinforcing the rules of the gang benefits the gang by promoting the rules of the gang and encouraging other gang members in their criminal activity, because they know that when they conduct violent activities, their fellow gang members will "have their backs." The killing of the passenger "[d]efinitely" conferred a benefit on the Norteño gang. The more violent the crime, the greater the benefit. In addition, the other two gang members joined in, reinforcing the gang's rules, similar to what took place in the Circle K incident. Moreover, because violence is glamorized in the gang culture, the more violent an individual is, the more status he has in his gang. The gang can utilize that individual's violent tendency for future benefit in carrying out assaults on rivals or fellow gang members who violate gang rules. Thus, a gang member increases his status and reputation within the gang by committing a violent act. The gang also benefits, because the more violent its members are, the more violent a reputation the gang will achieve, and it uses that reputation to control. Mariscal also opined the crimes were committed in association with the Norteño gang, in that two gang members and an associate committed the crimes together.

### *Evidence Presented to Diaz/J.P. Jury Only*

The link on the MySpace page was to a video labeled "Circle K beating surveillance video." The comment underneath read, "Me and a hom[ie] fuck a scrap,"

19.

with a dollar sign in place of the "s" in "scrap."[27]  The video showed two people beating a third person.  The beating continued even after the victim was on the ground.

Berry identified the two assailants as Plympton and Pantoja.  They had exited the store after purchasing some items.  As the victim was approaching the doorway to exit, Plympton came back into the store and immediately attacked the victim.  The victim back-pedaled away from Plympton, but fell to the ground.  Pantoja joined in the beating within a couple of seconds of Plympton's initial assault, but after the victim was already down.  The victim was on the ground, covering his face and head, while Plympton and Pantoja continued the attack by punching and kicking him.

In the course of his investigation having to do with Pantoja's gang involvement, Berry spoke with juvenile probation officers and reviewed police reports.  In 2006, when Pantoja was 13, he showed up at a school at which he was not enrolled, wearing red, and was arrested for possession of marijuana for sale.  There had been a fight close to the school between Norteños and Sureños a few days earlier.  Pantoja had also shown up at the school, again wearing red clothing, during the time of the gang fight. Shortly after Pantoja turned 14, he and three friends were at the Shasta Mall in Redding.  Pantoja instigated the robbery of someone at the mall by punching the person in the face and running off with his hat.

### *Evidence Presented to Pantoja Jury Only*

Hatfield interviewed Kellie Sample late on the evening of August 6.  Kellie Sample related a conversation that took place while she drove defendants and J.P. to Turlock.  She overheard Pantoja say to the two in the back seat, "I can't believe you did that, Bro."  During the phone call with Pantoja on her way home, Pantoja told her Diaz had shot somebody, and that Diaz was stupid.  Pantoja said they were going to take the

---

**27**    Berry explained that Norteños do not like to write the letter "S" because it is representative of "south" or "Sureño."  As a result, they sometimes will line out the letter, which may cause it to look like a dollar sign.

victim's car.[28] He heard "Pop, pop," then turned around and saw the victim take a couple of steps and then fall. The three immediately took off running and ended up at the Riverbank home of one of Pantoja's friends. Pantoja began crying during this telephone call.

## II[*]

### DEFENSE EVIDENCE

### *Evidence Presented to Both Juries*

On August 6, Hatfield interviewed Shawn Sample, Kellie Sample's husband. Shawn Sample said Pantoja claimed Norteño and took after Pantoja's father, who was also a Norteño.

Jesse De La Cruz was a former street gang and prison gang member. He had a Masters Degree in Social Work and, as of trial, was working on a Doctorate in Education with a dissertation on gangs. He had published a memoir, and also been published in a peer review journal. He testified as an expert on J.P.'s behalf.

De La Cruz grew up in Woodlake, a small town in Tulare County. He explained that in Northern California, a person in a street gang generally is from the neighborhood. If that person is from the neighborhood and wants to be in the gang, someone lets him come along. There is no big ritual, as there might be in Southern California, where being "jump[ed] in" — beaten by several gang members for a particular period of time — is more prevalent.

The gang to which De La Cruz belonged was mostly involved in activities relating to territorial respect. If someone came to their neighborhood and disrespected the gang, his gang would go to the other neighborhood and do something to them. Criminal conduct occurred, but protection of the neighborhood from other people was the focus of

---

[28]     According to Kellie Sample, Pantoja used the word "they."

[*]      See footnote, *ante*, page 1.

the gang at the time. De La Cruz became involved in criminal activity, including stabbing someone, selling drugs, burglary, and shoplifting. He went to prison a number of times.[29] He never committed a crime for the gang unless they went out to beat somebody specifically for that reason. Every other crime he committed was for himself and had nothing to do with the gang. He never gave the gang anything.

De La Cruz explained that the experience of involvement in a gang was completely different in prison. Prior to 1978 or so, everyone got along in prison. There was no north and south, unless someone was in the Mexican Mafia or Nuestra Familia, in which case there was a conflict. But a person could be in prison and not be in either one. In the summer of 1973, four men from Southern California jumped two members of Nuestra Familia at one of the prisons. The next day, the Nuestra Familia hit six men from Los Angeles. As time went on, "it was continuous blood being spilled." In 1978, the north and south "stuff completely happened."

Based on his experience, De La Cruz opined that gang members would be more forthcoming with someone like him, rather than with a member of law enforcement. When gang members debrief to law enforcement, they are always looking to gain some sort of benefit. In his experience, gang members do not talk to the police unless they are "jacked up" or detained or under arrest. Then, they never tell the police the truth. While he was not calling Mariscal a liar, De La Cruz found the information on which Mariscal relied to be "somewhat tainted." Mariscal was getting information from individuals who had everything to gain by telling him what he wanted to hear.

In De La Cruz's experience, some of the street gangs in Los Angeles were organized. He had never seen a Northern California street gang that had a hierarchy or was organized, in contrast to the prison gangs. A "shot caller" did not really tell people what to do; he was simply the toughest of them all. Gang members come together for

---

[29] De La Cruz's last day of imprisonment was April 2, 1996.

22.

various reasons, perhaps for protection, camaraderie, or to feel a sense of significance. The Norteño gang is attractive to youngsters because of the rhetoric, the way gang members carry themselves, and the way other people look at them — something akin to respect. When De La Cruz was growing up, juveniles from the neighborhood would be schooled concerning the types of crimes they could and could not commit. Now, there is no such schooling, and juveniles are not controlled by anyone.

When asked how Norteño gangs in prison spread influence to the streets, De La Cruz explained that the gang designates somebody in a specific institution who has the authority to operate the institution. He tells someone from, for example, Stanislaus County, who is about to be released, to get the "brothers" together and establish a regiment in Stanislaus County. The resulting regiment is not made up of criminal street gangs. Rather, it is made up of Nuestra Raza members who are committed to going out to the streets to "represent" and make money and kill and to do whatever needs to be done to take care of business. Periodically, the regiment leader will get someone from a street gang who he believes has the potential to be someone with whom to be reckoned. But going to markets and shooting people or "jack[ing]" people for their cars is contradictory to the gang's goal, which is to make money, generally by selling drugs. If someone infringes upon them making money and their drug dealings, then they may decide they need to "take[] care of" that person.

Based on De La Cruz's training and experience,[30] he opined that criminal activity such as robbing someone outside a convenience store typically would not be the result of Nuestra Familia's directive. Robbing someone for a car has nothing to do with the Nuestra Familia or Nuestra Raza or Norteños, as there is no money involved.[31] Drug

---

[30] In addition to his personal experience, De La Cruz had stayed current by talking with people in the gang lifestyle and through education and research.

[31] Mariscal testified in rebuttal that the leaders of the gang have ordered robberies for the gang's benefit. Robberies are one of the primary activities of the gang, and one of the

dealing, by contrast, is the type of criminal activity that might reflect a gang strategy or purpose, because it is a money maker. A shooting over a vehicle does not benefit the Nuestra Familia; in fact, it is more likely to be detrimental, because the police presence will shut down any drug dealing in the area. In De La Cruz's opinion, the idea the crimes charged in this case were committed to promote a specific gang was "ludicrous," and whatever happened did not have anything to do with a gang. In his opinion, the only one promoting gangs was the media. He was not pro gang, but believed that, in this and many gang cases, what was happening was unjust, and the gang notion was used to inflame juries.

De La Cruz explained that there is a difference between Norteños and Northerners. A Norteño is someone who is chosen by the designated individual at a specific penitentiary as a prospective soldier. The chosen person is then schooled and educated in the 14 Bonds. A Northerner is someone from Northern California. He is not involved in gang politics. He makes no decisions.[32] As for how many members typically comprise a Norteño regiment on the streets, it depends on how many Nuestra Raza and possibly Nuestra Familia members happen to be available. Prison gangs are completely different from street gangs, so Northerners and street gangs are a different dynamic. The Northerners do not fall under the authority of the Nuestra Raza regiment. This does not mean, however, that a Northerner can disrespect a member of the Nuestra Raza regiment

___

ways in which the gang makes money and enhances its violent reputation. He acknowledged, however, that the Stanislaus County Sheriff's Department issued a media relations press release on August 6, in which it was stated that based on information obtained by investigators, it was determined the incident at ampm was not gang related, although the suspects were gang affiliated.

[32] De La Cruz acknowledged the existence of a type of upward mobility, however, from Northerner to Norteño to Nuestra Raza to Nuestra Familia. For a Northerner to achieve Norteño status, someone in Nuestra Raza has to know and support that person. Then there is a vote, followed by a probationary period, during which the process of schooling or educating begins. After that, the person is allowed in the gang.

without consequences. The Nuestra Raza likely would shoot or kill such a person. Nevertheless, gang members do not kill people and then let everyone know they did it so they can elevate themselves. Rather, the objective is to get away.

De La Cruz did not believe a reputation for violence mattered, one way or the other, to a Norteño gang member on the streets. However, the gang itself will refuse to have a "weak link," because such a person is a liability. Such a person "get[s] in the way" because, for instance, other gang members have to worry about him, and this distracts them. Weak links do not get into prison gangs or street gangs.

De La Cruz acknowledged that in Stanislaus County, there was a group of three or more members who all claim the color red and the number 14, and whose members had committed certain crimes, and that such persons referred to themselves as Norteños. If such persons are actual gang members, he "suppose[d]" it would be important for them to have a violent reputation. It could help them in such ways as establishing turf and preventing rival gangs from taking away drug profits. The present case did not involve rivals or turf, however.

If a person being classified in jail says he does not want to be housed with Southerners, it is not an indication the person is a gang member. It is possible the person would say that because all his friends or associates are Northerners. In addition, there can be a danger, based on the person's family or where he lives, if he does not specify affiliation.

De La Cruz found there to be a racial component to the gangs. He was in the process of debriefing an individual who was a Norteño Nuestra Raza. This person was in a treatment center, and De La Cruz was his sponsor. This person was upset about the notion an African-American could be high up in the organization. He told De La Cruz there would never be a Black man calling shots for the Nuestra Familia, Nuestra Raza, or Norteños. They might use such a person, but minimally, and never in such a position.

25.

De La Cruz interviewed J.P. at juvenile hall and asked how he met Diaz. J.P. explained that he had gone to the park to play basketball. Diaz lived across the street, although J.P. did not know it. Diaz came out and the two talked a bit, then started playing ball together.

Based on everything he had reviewed, De La Cruz did not believe the incident at the fair, in which Diaz allegedly flashed a gang sign, was an indicator of J.P. subscribing to or trying to be part of a criminal street gang. In De La Cruz's opinion, it took more than simply being in the presence of someone throwing a gang sign or committing a homicide, to establish gang association. In his opinion, J.P. was not an associate of the Norteño street gang on August 5.[33] The fact he was African-American and he was with two Hispanics, in and of itself, meant he was not associated with gangs, but was with people he considered his friends. Everything De La Cruz knew about what happened "scream[ed]" that it had nothing to do with gangs. This was so even in light of the MySpace page. In De La Cruz's opinion, defendants and J.P. were not gang members. This was true even of Pantoja. He might claim he was, but he was not. Claiming did not mean he was.

In De La Cruz's opinion, a crime could be committed by gang members without the crime being gang related. This would be true even if one of the people involved threw out a gang sign sometime earlier or shouted a gang slogan at a different location, and even if one or two of the group were wearing some kind of red item of clothing.

J.P. testified that he was 15 years old when he was arrested in this case. Both his parents are African-American. Neither was gang affiliated.

Prior to his arrest, J.P. resided in Turlock, about five blocks from Columbia Park. He often went there to play, as there were always other people there. He met Diaz, who

---

[33] De La Cruz explained he had never personally known anyone who was a gang associate. He had had friends who were associated to him as an individual as his friends, but they were not associated to him as a gang member.

lived across the street from the park, about five months before the events of this case. They met at a barbecue given by a friend of J.P. After that, they "[k]ind of maybe a little bit" became friends. They played basketball together at the park, and they went to the fair the one night. J.P. met Pantoja a couple of times when Pantoja was at the park with Diaz. Except for the first time J.P. met Diaz, if Diaz was present, Pantoja was also there. These occasions usually involved playing basketball and/or smoking marijuana.

At the fair, there was no discussion about doing anything gang related. J.P. did not throw any signs at anyone. They were simply walking through the fair, mingling and talking with people, and Diaz just threw up the sign. The police took their names and made them leave the fair. J.P. did not claim to be a Norteño to anybody. He did not consider himself to be a Norteño, a Northerner, or a gang associate of any type.[34]

Pantoja lived in Riverbank. J.P. had not been to Riverbank before August 4. That afternoon, he was with "Ray Ray."[35] Originally, J.P. was supposed to go to Ray Ray's house in Modesto, but he and Ray Ray saw Diaz and Pantoja at the bus stop. Diaz and Pantoja said there was a party in Riverbank that night. Ray Ray could not go because he had other commitments, but J.P. decided he would attend. J.P. had $30 or $35 that he got either from his mother or from doing chores for his aunts. He also had some marijuana in a bag. J.P. had smoked a blunt (a small cigar in which the tobacco had been replaced

---

**34**      J.P. was aware of the color, number, and tattoos associated with Norteños. He first became exposed to people claiming to be Norteño when he was in elementary school. He was aware the Norteño gang controlled Columbia Park. He had seen people using the park who were not gang members, however. J.P. was "cool" with everybody. J.P. knew Pantoja was a Norteño gang member, because he had heard Pantoja say it and had seen him wearing red. He had also seen Diaz flash a W for "west" prior to the incident at the fair, and had heard him say, "West Side Turlock" on a number of occasions. He had also seen Diaz wearing red. He never thought Diaz was a gang member, however, because Diaz never told J.P. that he was, and J.P. never heard him say "Norteño" or anything like that.

**35**      J.P. had been to Ray Ray's house many times. He was aware Ray Ray had many family members who were members of the Norteño gang.

with marijuana) before he got on the bus. J.P. was a regular user of marijuana and had built up a tolerance for it. It made him relaxed and mellow.

The four rode the bus from Turlock to Modesto, where they had to switch buses to continue on to Riverbank. Ray Ray left them at the bus stop in Modesto, and defendants and J.P. then took the other bus to Riverbank. There was no discussion about committing crimes. J.P. did not know either defendant had a gun.

When the three got off the bus and were walking to Pantoja's house, they saw an ice cream man who was pushing a cart. Pantoja told Diaz and J.P. to watch this, that he was going to get the ice cream man. There had been no discussion about robbing the ice cream man, but Pantoja pulled a gun from his waist. His shirt had been over it. Pantoja crossed the street to the ice cream man, pointed the gun at him, and demanded money. The man put up his hands, and Pantoja reached into the man's pocket and took the money. Pantoja then got on a bicycle he had had with him since J.P. first met up with defendants, and rode off. Diaz knew where Pantoja lived, and he and J.P. kept walking to Pantoja's house. Once there, nobody talked about what had happened. Pantoja had gotten around $70 or $80. J.P. did not ask for or receive any of it. He did not think Diaz was given any of it, either.

At Pantoja's house, defendants and J.P. smoked marijuana and watched television. Pantoja's parents left, and Pantoja had to babysit his younger siblings. While Pantoja was doing this, Diaz and J.P. went to a place nearby that sold "taco truck burritos," and they each ate one. They then returned to Pantoja's house.

Up to that point, nobody had been drinking any alcohol. Pantoja telephoned his mother and then his stepfather and asked them to get Four Loko from the store. When Pantoja's stepfather returned to the house, he gave Pantoja four cans of Four Loko. J.P. did not drink any. Defendants each drank one, then the three left the house. As they were walking, defendants were each drinking another one. The three had also shared about three blunts by that time. All J.P. knew was that the party was supposed to be later

28.

that day.  Because he had never been to Riverbank, he did not really know where they were supposed to be.

After leaving Pantoja's house, the three walked to a store down the street, where they got more cigars.[36]  They then went to the home of someone Pantoja knew, where they smoked more marijuana.  J.P. was feeling the effects of the marijuana.  He was relaxed.

The three left after about 15 to 20 minutes and started walking again toward the party.  They saw Patteson, whom J.P. had never met.  At Star Market, Patteson bought them cans of Four Loko.  J.P. merely purchased a bag of chips with his own money.

Defendants and J.P. left the market and walked to the school behind the movie theater.  As far as J.P. knew, they still had plans to go to the party.  At the school, they went up on the roof, smoked marijuana, and defendants drank.  Defendants each had a can of Four Loko.  J.P. did not remember if they passed it back and forth, who finished first, or whether they shared the last part of the last can.

The three stayed on the roof for a little while, then got back down.  There were benches at the school, and they went and "chilled" on the benches, smoking marijuana and a regular cigar, for about 10 minutes.  After that, they climbed over a wall.  J.P. believed defendants were drunk.  J.P. did not recall anyone shouting anything gang related or seeing Gilpin.  He did not see anyone throwing gang signs.  There was no discussion whatsoever about gangs.

J.P. thought "he" finished his can of Four Loko and threw it over the fence, but he did not remember clearly.[37]  The three then walked around to the front of the theater.  There were two older ladies coming from the movies.  Pantoja suggested they rob the

---

[36]     The cigars J.P. favored could be purchased individually or in a pack.  The three bought them individually.  Defendants appeared to have their own money.

[37]     J.P. was not asked to specify which defendant.

ladies. J.P. refused, saying something like, "That's stupid," or "Why would you want to rob ladies?" Diaz agreed and said, "Yeah, that is stupid." J.P. did not intend to rob anybody and did not urge either defendant to rob someone.

Diaz then said he wanted to see or to hold the gun, and Pantoja gave it to him.[38] Pantoja said to Diaz or both Diaz and J.P., "Don't bitch up," or "Don't get soft." Diaz did not say anything about committing a robbery, and the three did not discuss committing robberies.

The three headed to the ampm down the street so Pantoja could buy more cigars to hollow out for marijuana. There was no discussion about doing anything of a criminal nature. J.P. had no intention of committing a crime. J.P. did not go inside with Pantoja, because, although Pantoja was old enough to buy cigars, there was a possibility the clerk might not sell to him if he thought Pantoja was buying for a minor.[39] There was no plan to commit a crime.

J.P. was getting ready to give Pantoja some money, when Diaz pulled the gun on Gomez, who was coming out of the store and walking toward his car. Diaz had not said anything to J.P. or Pantoja prior to pulling the gun. There had been no discussion about

---

[38] Dave Wallace, a private investigator working on Pantoja's behalf, had, through his experience and observations, an enhanced ability to observe and recognize when someone was carrying a concealed handgun. In his opinion, the Star Market video showed Diaz checking his waistband and adjusting his pants in a manner that suggested he was carrying a handgun in his waistband while inside the store. He could not say for certain what was under Diaz's shirt, however. Wallace acknowledged he had seen a number of men at the courthouse, pulling up their pants in the same way and yet getting through the metal detector.

Wallace also investigated J.P.'s account of the robbery of the ice cream man. He was unable to find any evidence any such robbery occurred.

Because of anticipated legal issues, Wallace testified before the Diaz/J.P. jury only. His testimony was then read to the Pantoja jury.

[39] J.P. and defendants went into Star Market when Patteson was buying the Four Loko cans, but J.P. did not talk to or stand near Patteson.

30.

robbing Gomez. Bettencourt was on his cell phone on the other side of the car. Nobody said anything to Bettencourt before Diaz pulled the gun. When the gun was pulled, J.P. was behind Diaz, although he was not sure how far. Pantoja was beside J.P. The gun was tucked into Diaz's waist, under his shirt.

Diaz pulled the gun, put it in Gomez's face, and told Gomez to give him his keys. Gomez had his hands up. He had a drink in one hand and the keys in the other hand, and he told Diaz that he was not going to give him the keys. Neither J.P. nor Pantoja said anything, but, as Gomez and Diaz went around the car, J.P. walked behind Diaz. He did not know why, as he had no intention of stealing a car or robbing anyone, or of acting as a gang associate.

At some point, Diaz put his hand on top of the gun and slid it back. Gomez broke away from Diaz and started toward the store door. Diaz pointed the gun in the direction of Pantoja, who was still beside Diaz, and yelled to get the doors. J.P. stood in front of the doors of ampm. He did not say or do anything to suggest he had a gun. He did not touch Gomez, except that they were "shouldering" each other as Gomez tried to get past J.P. to get inside the store. J.P. did this because Diaz had pointed the gun in his and Pantoja's direction and told them to get the door. J.P. was scared. He did not know whether Diaz would fire, and felt anyone could have gotten shot.

Gomez got past J.P. J.P. saw Bettencourt standing in front of Diaz, on the side of the car. J.P. did not recall Pantoja's location. Diaz yelled to give him the money.[40] Bettencourt took money from somewhere and threw it toward Diaz's face. J.P. then saw Diaz shoot twice. J.P. ran. Defendants also ran, although Diaz picked up the money. J.P. never asked for or received any of it.

---

[40] J.P. remembered Pantoja also yelling at Bettencourt, but did not know what he was saying. Pantoja was somewhere behind or to the side of Diaz.

Pantoja knew someone who lived around the corner from ampm, so the three hopped the fence into the person's backyard. Defendants appeared to be drunk.**41** As one of defendants was hopping over the fence, he fell into the doors and the doors opened. A lady was walking in the kitchen, and Pantoja told her that he knew her brother. The lady got her brother, who went into the garage with defendants and J.P. At some point, Diaz, who seemed kind of surprised, said he dropped the gun and lost one of his shoes at ampm. The brother gave Diaz a shoe. Pantoja told the brother they had been at a party and someone was shooting at them, and that they needed a ride.

Defendants and J.P. were given a ride to Pantoja's house. Pantoja talked to his mother, who came out, looking shocked and upset. She took them to Diaz's house in Turlock. Pantoja's mother then told Diaz's mother what happened. Diaz's mother asked Diaz why he did it. J.P. believed Diaz responded, "If I did it once, I can do it again."

J.P. then left. He was almost across the street when defendants came out of the house. The three crossed Columbia Park, hopped a couple of fences, and went to the house of a girl J.P. knew. Diaz had a shotgun case in his hand and a small leather pouch full of shotgun shells. While the three were walking across the park, Diaz said that if any cops were to pull up, he would just start shooting at the cops. He said that if he went to prison he would be "on the main line" with his father. Diaz told J.P. not to snitch.

J.P. and defendants were the only ones at the house. J.P. was lying on the couch by himself, and defendants were talking to each other and joking. They asked J.P. what was wrong with him and why he was so down. J.P. told them it was not a game, and that somebody just got shot. J.P. felt a bit intimidated because there was a shotgun present and defendants did not feel the way he did.

---

**41** At no time, after defendants started drinking, did J.P. see either defendant vomit or pass out. He was able to have conversations with each of them on various subjects.

J.P. and defendants stayed at the girl's house from about 4:00 a.m. until around 5:00 a.m. or 6:00 a.m., when Diaz's mother came, and defendants left with her. She asked if J.P. wanted to go, but he declined. He stayed at the girl's house for a while, then went home. That was the last time he saw either defendant outside of court. J.P. later turned himself in.

In March 2012, J.P. was interviewed by Mariscal and the prosecutor. J.P.'s attorney requested, but was not present during, the meeting. J.P. gave the statement so he would not have to spend the rest of his life in prison. He thought he might get some kind of deal, although that did not happen. J.P. told Mariscal and the prosecutor the truth and did not refuse to answer any of their questions.

### *Evidence Presented to Diaz/J.P. Jury Only*

At the time Hatfield interviewed Shawn Sample, Pantoja had not been located. Shawn Sample said he had seen Pantoja with a black .22-caliber handgun, that Pantoja had had it for the two weeks prior to the shooting, and that he had bought it in Turlock with money he received from an auto accident. Shawn Sample said defendants and J.P. had come to the Sample house the day of the shooting, and had left between 9:00 p.m. and 10:00 p.m. to go to a friend's house.

Dr. Marczinski, an associate professor of psychology at Northern Kentucky University, was a psychopharmacologist by training. She explained that psychopharmacology deals with the effects of drugs on thinking and behavior, and is an area in which psychology merges with medicine. Marczinski began conducting research into the effects of alcohol, including binge drinking, in 2002. She subsequently became involved in researching alcohol mixed with energy drinks (AED), which typically contain caffeine and other stimulants. She testified as an expert in AED's.

One of the key findings of Marczinski's research was that when alcohol is mixed with the stimulants found in energy drinks, the stimulants prevent the drinker from feeling as intoxicated as he or she would if only the same amount of alcohol had been

33.

consumed. This is "masking." Masking has a subjective component, but also objective components that can be observed. Someone observing a person who consumed a large number of AED's might see fewer symptoms of intoxication in the person than would be observable had the person consumed an equivalent amount of alcohol alone.

Marczinski's research subjects all are college students. As a psychologist, she incorporates her knowledge and the available research into the differences between a young brain and a brain that has matured. She explained there are differences between a 14-year-old brain and a 25-year-old brain, relative to the effects of alcohol consumption and stimulants. The brain does not complete its development until age 21, or even one or two years later in some people. That fact is relevant to why underage drinking is so harmful.

Marczinski was familiar with Four Loko. The empty can retrieved from the school yard after the shooting in this case was a Four Loko can. Four Loko was a beverage that contained a mixture of alcohol and energy drink ingredients. It contained alcohol, caffeine, taurine, and guarana. The can opened by means of a ring pull and so could not be closed once it was opened. The can's capacity was 23.5 fluid ounces. The alcohol by volume (ABV) was 12 percent, in contrast to beer, which usually is 4 to 5 percent. Thus, the ABV of one can of Four Loko was the equivalent of just under five 12-ounce (standard) beers. The taste of the alcohol and caffeine was overridden by the sugary, fruity taste of Four Loko.

There were many reports of problems associated with Four Loko, resulting in investigations by various agencies and state Attorneys General. In November 2009, the manufacturers and distributors of Four Loko publically were placed on notice, by state Attorneys General and the United States Food and Drug Administration (FDA), that the product was believed to be dangerous. The concerns had to do with consumers not being aware of how intoxicated they were; accidents and injuries that seemed more likely with consumption of AED's than with alcohol alone; and the appeal of the product to underage

34.

drinkers.[42]  In November 2010, the FDA gave the manufacturers two weeks to remove the stimulants from the product.  The manufacturers then reformulated the beverage so it contained alcohol alone.

Marczinski explained that in scientific literature, the definition of binge drinking is the consumption of five or more standard drinks by a male, or four or more by a female, on one occasion.  The drinker is likely to be legally intoxicated if the drinks are consumed within a reasonably short period of time.  Because of the ABV in a can of Four Loko, the drinking of one can in one sitting constitutes a binge.  For an adult, it would not be safe to consume a can of Four Loko unless consumption took place over four hours, which would be unlikely because the drink is carbonated and would go flat in that time.

The effects of alcohol consumption are seen at lower blood alcohol levels in inexperienced and younger drinkers than in drinkers who have more experience with alcohol or whose brains are fully developed.  At a blood alcohol concentration (BAC) of 0.10 percent to 0.13 percent,[43] balance clearly is impaired.  The drinker will probably stagger when walking and will appear uncoordinated.  He or she will have pronounced impairments in judgment and memory, and will perceive he or she is intoxicated.  From .14 percent to .19 percent, there will be significant impairment of all physical and mental functions, difficulty standing and talking, and profound impairments in judgment, perception, and reaction time.  At .15 percent and higher, vomiting may occur, and there may be blackouts.  From .20 percent to .29 percent, the sedative nature of alcohol becomes apparent, with double vision, slurred speech, an inability to stand or walk without assistance.  Loss of consciousness typically is observed, especially in less

---

[42]     Marczinski detailed some of the incidents that occurred across the nation in 2010. Some reportedly involved walking blackouts, psychosis-like episodes, and hallucinations. In some, there were objectively observable signs and symptoms of heavy intoxication. Ultimately, Four Loko came to be known as "Blackout in a Can."

[43]     In California, it is illegal for an adult to drive with a BAC of .08 percent or higher.

experienced drinkers.  At .30 percent to .39 percent, most individuals will exhibit loss of consciousness and inability to comprehend anything that is going on.  All thinking and cognitive abilities will be suppressed.  Fatalities may occur at this level.[44]

Where caffeine and other stimulants are present, much of the stupor and staggering will not be observable.[45]  There is also decreased perceived intoxication, in which the drinker perceives him- or herself to be less intoxicated than is actually the case.  In addition, the person objectively appears less intoxicated.  In terms of measuring cognitive function, the impairment of how the drinker thinks is the same in terms of AED's compared to alcohol alone.  In terms of balance and coordination, however, the impairment is less with an AED compared to alcohol alone.  AED's also have a priming effect, meaning the drinker wants to keep drinking more and for a longer period of time than with alcohol alone.[46]

According to Marczinski, a blackout is the failure to recall events of time during drinking.  A BAC of .15 percent is the typically accepted value at which it is predicted a blackout will be likely.  In Marczinski's research, young adults who consumed AED's reported having almost double the number of blackouts in the previous year than users of alcohol alone.  Younger, less experienced drinkers are more likely to experience a blackout if they are intoxicated, and rapid drinking is a strong predictor of blackouts.  At a BAC of .25 percent and above, there is a high likelihood of experiencing cognitive problems.  Blackout is part of that.

---

[44]  Younger people will die at lower levels because they choke on their own vomit.

[45]  Emergency room physicians coined the term "wide awake drunk" to describe the state.

[46]  In her research, Marczinski could only test human subjects to a maximum BAC of .1 percent, due to safety concerns.  Due to legal issues, she could only give alcohol to people 21 years old or older.  To research higher levels of alcohol and younger subjects, she sometimes used rats or mice.

With respect to the present case, Marczinski reviewed the J.P. interview, the scene videos, Diaz's probation report from a prior incident with respect to his drinking history, witness statements, and information received from Diaz's attorney regarding details of the case. Diaz self-reported to the probation officer that as of May, his use of marijuana was weekly or somewhat frequent, while he had barely any prior use of alcohol. J.P. described Pantoja's father as bringing four cans of Four Loko to the home. J.P. reported defendants drank one can each, then another can each as they left the house and walked through Riverbank. In addition, video showed two cans of Four Loko being purchase at 10:41 p.m. on August 4. J.P. reported (and DNA suggested) defendants passed one and possibly both of those cans back and forth as they drank.

Although Marczinski's findings were somewhat approximate and allowed for some variation, it appeared that six cans of Four Loko were consumed, and likely divided evenly between defendants. According to the J.P. interview, consumption began around 8:00 p.m. Thus, as accurately as Marczinski could say, Diaz consumed three 23.5-ounce cans of 12 percent ABV Four Loko, with the beverage's original AED formulation, between 8:00 p.m. on August 4 and roughly midnight of August 5. This was the equivalent of just over 14 standard cans of beer and three strong cups of coffee. Diaz was 14 years old at the time, and had weighed 170 pounds earlier that summer. There was information Diaz ate a burrito around 6:00 p.m. on August 4.

Marczinski worked with a body weight range of 170 to 190 pounds, and assumed both that the third can of Four Loko was fully consumed and that it was half consumed. A BAC of between .21 percent and .29 percent was possible. In that range, with alcohol consumption alone, expected effects would include difficulty staying awake, double vision, slurred speech, inability to walk or stand without assistance, confusion, and loss of consciousness in less experienced drinkers. Extrapolating from Marczinski's research, the stimulant effects of the Four Loko drinks would mask or counteract difficulties staying awake and in balance and coordination. The rapidity of the consumption, plus

Diaz's age and inexperience with alcohol and the high BAC, would increase the likelihood of a blackout.[47]

Marczinski explained that a 14-year-old is more vulnerable to the adverse effects of AED's than an older person based on his or her brain. This is because the frontal cortex and prefrontal cortex, which allow humans to perform the most complex functions (for example, having long-term plans, controlling impulses, and thinking through the implications of actions), are still developing.[48] Alcohol first affects the front part of the brain, and so reduced inhibitory control is seen early on in drinking. An adolescent will have much more trouble controlling impulses when drinking than an adult, because alcohol first acts on the not-yet-fully-developed part of the brain that manages impulse control. Eventually, if a large amount of alcohol is consumed, the whole brain essentially is shut down. When caffeine is also ingested, however, the person is clearly intoxicated and his or her brain is not functioning, but the internal structures of the brain that should be shutting down so the person falls asleep are prevented from shutting down by the caffeine. Because caffeine stays in the system at least six hours, its effects are maintained for a period of time, even as blood alcohol is dropping. In Marczinski's studies, some of the most pronounced effects seen with caffeine counteracting alcohol occur when blood alcohol starts to drop.

---

[47] Marczinski opined that a college student who drank three cans of Four Loko would "probably be on a hospital gurney." If Diaz drank three cans, it was possible he would be on a gurney in a hospital after the third can. She would expect vomiting and slurred speech, although the stimulants in the drink might counteract any inability to maintain body stability such as falling over or swaying back and forth. His BAC at 12:15 a.m. would have been between .2 percent and .26 percent at that point. Because most injuries and accidents occur once BAC starts descending, if he were to end up on a hospital gurney, she would expect it to occur around 2:00 a.m. to 3:00 a.m.

[48] Marczinski explained that the thinking through of implications involves weighing cost versus benefit, and right versus wrong.

Adolescents struggle with impulsivity, which involves acting without thinking and could include following direction from somebody without considering whether it serves a good purpose. If a 14-year-old and an 18-year-old are together, it is likely the older person will be in charge and better able to think through courses of action and their implications. According to the J.P. interview, Pantoja seemed to be in charge even before anyone became intoxicated. J.P. reported that at one point, Pantoja robbed an ice cream man at gunpoint while J.P. and Diaz, who were younger, stood by and watched. Later, after some drinking had occurred, Diaz rebuffed a request by Pantoja to join in the robbery of two old ladies, according to the J.P. interview. Before they arrived at ampm, Diaz expressed curiosity about Pantoja's handgun, and Pantoja let him hold it. There was no indication in the interview that Pantoja was placing Diaz in charge.

According to the J.P. interview, he and defendants smoked marijuana throughout the evening while at the home of Pantoja's mother. According to Marczinski, marijuana would not alter the BAC, but would add to the intoxication, the largest component of which was the alcohol. The BAC and resulting impairments in the brain would have been rising and nearing their peak at the time Diaz reached ampm. In Marczinski's opinion, a 14-year-old boy with little to no experience with drinking, who was provided with three 23.5-ounce cans of Four Loko, might know the product would likely get him drunk, but would have no reasonable expectation as to the nature and severity of the intoxication that would result from drinking those three cans.[49]

### *Evidence Presented to Pantoja Jury Only*

The parties stipulated Marczinski would testify that, as sold in August 2010, Four Loko was a mixture of alcohol and energy drink. Drinking an AED such as Four Loko will cause the same intoxicating effects in humans as any other alcoholic beverage with

---

[49]    In viewing the Star Market and ampm videos, Marczinski observed no objective sign or symptom of impairment, as to any person shown, caused by ingestion of any substance in her field of expertise.

the same amount of alcohol content. In some cases, drinking an AED like Four Loko can cause the observable effects of alcohol intoxication to be masked or hidden to the drinker and people observing the drinker. One can of Four Loko, as found by Gilpin at the school, contained 23.5 fluid ounces of beverage. The alcohol concentration of that beverage was 12 percent by volume, which was the same percentage of alcohol as most wine. Each 23.5-ounce can of Four Loko contains the alcohol and intoxicating equivalent of 4.7, 12-ounce cans of beer or 4.7 five-ounce glasses of wine. Marczinski watched the Star Market and ampm videos and observed no objective symptoms of alcohol intoxication exhibited by defendants or J.P. Some typical objective symptoms of alcohol intoxication include lack of balance, falling down, vomiting, slurred speech, and passing out.

## DISCUSSION

### I[*]

#### BIFURCATION OF GANG ALLEGATIONS AND RELATED EVIDENTIARY ISSUES

Defendants raise a number of issues concerning the trial court's refusal to bifurcate the gang allegations and its admission of certain gang-related evidence. We agree that some error occurred. Nevertheless, we find no cause for reversal. It would be unreasonable, and would defy common sense, to believe jurors were able clearly and rationally to sort through the gang evidence insofar as the gang enhancement allegations were concerned, but at the same time were so overwhelmed by that evidence that they allowed it to affect their verdicts on the substantive charges, in violation of the trial court's instructions. In light of testimony concerning how Diaz came to possess the gun, as well as other evidence, this is so even as to Pantoja, some of whose jurors found the gang enhancements to be true.

---

[*]       See footnote, *ante*, page 1.

40.

A.      **Refusal to Bifurcate Gang Enhancement Allegations**

Diaz contends the trial court erred by refusing to bifurcate the gang enhancement allegations from the substantive offenses.  He claims the gang evidence was irrelevant to the substantive charges, and was highly inflammatory.  He says the trial court abused its discretion, and even if it did not, the gang evidence was so prejudicial that its admission denied Diaz a fair trial.  Pantoja joins in the argument and, for the same reasons, argues the trial court erred by denying his motion for a new trial insofar as it was based on the trial court's failure to bifurcate the gang allegations.  Diaz joins in the argument.[50]  We conclude the trial court did not err.

1.      Background

Diaz moved, in limine, to bifurcate the gang allegations.  Relying on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), Diaz claimed "the admission of such an amount of gang evidence as would be permitted to prove the gang enhancements would unduly inflame the jury regarding the other counts and impermissibly function as otherwise inadmissible character or propensity evidence or, even worse, as evidence of 'guilt by association.' "  Pantoja joined in the motion.  The People opposed bifurcation, arguing it was unwarranted because evidence of gang activity was important to show motive and intent for the charged offenses and the gang enhancement.  After argument, the trial court noted the prosecutor's assertion the gang evidence would be inextricably bound up with motive, and it denied the motion to bifurcate.

The gang evidence adduced at trial is summarized in great detail, *ante*.  As noted, the gang enhancement allegation was found not true as to Diaz.  Pantoja's jury was unable unanimously to agree on it.

---

**50**      We set out the standard of review applicable to denial of a new trial motion in the next portion of our discussion.  Our conclusion is the same whether we review the bifurcation claim under the law applicable to rulings on severance and bifurcation or the law applicable to rulings on motions for a new trial.

41.

Pantoja subsequently moved for a new trial on various grounds. In pertinent part, he argued the gang evidence presented by the prosecution irremediably prejudiced the jury against him, made it more likely the jury would believe he had a bad character, and made it more likely the jury would decide he committed the substantive offenses. Pantoja suggested that even though the jury declined to find the gang enhancements true, it was possible compromises were made during deliberations. Diaz also moved for a new trial.[51] In pertinent part, he argued the gang evidence, coupled with evidence of his history of delinquency, was irrelevant and prejudicial, and the nature and volume of the evidence was such that it served only to demonstrate Diaz's criminal disposition. Hence, he concluded, it likely contributed to the guilty verdicts on the substantive charges. The People opposed both motions.

After argument, the trial court denied the motions. The trial court distinguished the amount and strength of the nongang-related evidence in *Albarran*, and found the juries in the present case were able to put aside the gang evidence in reaching their verdicts.

2.  Analysis

Section 1044 gives a trial court discretion to bifurcate proceedings. (*People v. Calderon* (1994) 9 Cal.4th 69, 74-75.)[52] By analogy to severance of charges, " ' "[t]he burden is on the party seeking [bifurcation] to clearly establish that there is a substantial danger of prejudice requiring that the [gang enhancement allegations] be separately tried." [Citation.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

---

[51] Pantoja joined in the motion.

[52] Section 1044 provides: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

"In general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.]' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) Thus, with respect to whether bifurcation of gang enhancement allegations ordinarily should be ordered, the California Supreme Court has distinguished between a prior conviction allegation, which relates to the defendant's status and may have no connection to the charged offense, and a criminal street gang allegation, which "is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) Because of this difference, less need for bifurcation of a gang enhancement allegation usually exists. (*Ibid*.)

This does not mean bifurcation should never be ordered, however. (*Hernandez*, *supra*, 33 Cal.4th at p. 1049.) " '[E]ven where gang membership is relevant,' . . . 'because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it.' [Citation.]" (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 655.) "The predicate offenses offered to establish a 'pattern of criminal gang activity' [citation] need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt. [¶] In cases *not* involving the gang enhancement, [the Supreme Court has] held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent

to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Hernandez*, *supra*, at pp. 1049-1050.)

The court went on to say that "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself — for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged — a court may still deny bifurcation." (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) The high court analogized the issue to the severance of charged offenses, in which judicial economy is a factor to be considered. (*Ibid*.) " 'When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Citation.]" (*Ibid*.) The court recognized that "[t]he analogy between bifurcation and severance is not perfect" (*ibid*.), but concluded that "the trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (*Ibid*.)

" 'A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side. Therefore a defendant seeking severance must make an even

stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial.' [Citations.]" (*People v. Sully* (1991) 53 Cal.3d 1195, 1222.) In determining whether a trial court abused its discretion in denying severance, we consider the following factors: "(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 161.)

Turning to the case before us, the burden is on defendants to establish the trial court's denial of bifurcation exceeded the bounds of reason, all the circumstances being considered. (*People v. Merriman* (2014) 60 Cal.4th 1, 37; *People v. Giminez* (1975) 14 Cal.3d 68, 72.) "We review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date. [Citations.]" (*People v. Welch* (1999) 20 Cal.4th 701, 739; see *People v. Turner* (1984) 37 Cal.3d 302, 312 [addressing ruling on severance motion], overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149.) By parity of reasoning, we do not consider, at this juncture, the failure of defendants' juries to return true findings on the gang enhancement allegations.

The same judge presided over both the preliminary hearing and trial. It is apparent from the evidence adduced at the preliminary hearing that there was no evidence of intergang rivalry or retaliation, as is often seen in cases in which evidence of gang membership or activity is relevant to motive. (See, e.g., *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 654-655; *People v. Carter* (2003) 30 Cal.4th 1166, 1194-1195.) Nevertheless, at least some of the gang evidence was relevant to show defendants' motive for the charged crimes.

"Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; accord, *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239-240.) "The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.] '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.] [¶] Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang.' [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; see *People v. McKinnon, supra*, 52 Cal.4th at p. 655.) "[T]he motive here was relevant and important, both to the actual crime[s] committed . . . and to the requisite intent for the enhancement. Case law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.) Accordingly, at least some of the gang-related evidence would have been admissible even if the gang enhancement allegations had been bifurcated.

The criteria for severance enumerated in *People v. Mendoza, supra*, 24 Cal.4th at page 161 (as well as numerous other cases) "are not equally significant." (*People v. Bradford, supra*, 15 Cal.4th at p. 1315.) "Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose." (*Id.* at p. 1316.) " '[T]he issue of cross-admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. [Citations.]' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 849.) Complete (so-called two-way) cross-admissibility is not required. (*Ibid.*)

That the juries did not find the gang enhancement allegations proven beyond a reasonable doubt does not mean the gang evidence was irrelevant or that the trial court

abused its discretion by denying the bifurcation motions in the first instance. Defendants offered evidence to show the offenses were not related to a criminal street gang, and the resolution of conflicting evidence was a matter for the jury. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

In light of the foregoing, defendants have failed to establish the trial court abused its discretion by refusing to bifurcate the gang enhancement allegations. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1051; *People v. Mendoza*, *supra*, 24 Cal.4th at pp. 161-162; *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1358.) Nor have they shown a unified trial "resulted in such gross unfairness as to amount to a due process violation. [Citation.]" (*People v. Capistrano*, *supra*, 59 Cal.4th at p. 853.) This is a "high constitutional standard": " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*Albarran*, *supra*, 149 Cal.App.4th at pp. 229-230, fn. omitted.)

Evidence of gang membership has a "highly inflammatory impact" (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22) and "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense[s] charged" (*People v. Carter*, *supra*, 30 Cal.4th at p. 1194). The same is true of gang-related evidence, particularly regarding criminal activities. (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) Nevertheless, and contrary to defendants' assertions, the gang evidence presented at trial was no more inflammatory than the evidence related to the charged offenses. Significantly, jurors were instructed, both near the outset of Mariscal's

47.

testimony and again at the conclusion of the evidentiary portion of trial, that they could not infer bad character or criminal disposition from the gang evidence. "Jurors are routinely instructed to make . . . fine distinctions concerning the purposes for which evidence may be considered . . . . [Citation.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) Even where gang evidence is concerned, "[i]t is, of course, presumed the jury understood and followed the court's instruction in the absence of any showing to the contrary. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 613.) The record contains no such showing here. In our view, the instruction cured any potential prejudice. (See *People v. Homick* (2012) 55 Cal.4th 816, 866-867; *People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1168; see also *People v. Jones* (2013) 57 Cal.4th 899, 927 [where jury fails to convict on some charges, reviewing courts are "confident" jury differentiated among defendant's crimes].)[53]

Pantoja argues the case against him was "borderline," and he points, as demonstrating prejudice, to the fact J.P., "who largely escaped the taint of gang evidence, was acquitted of the charged crimes, despite the fact that J.P. and [Pantoja] were similarly positioned in terms of their relationship to the attempted carjacking, and the evidence in fact demonstrated that J.P. did more than [Pantoja] at the scene." To ascribe the fact J.P. obtained a more favorable result than Pantoja to the failure to bifurcate the gang enhancement allegations would be speculative at best. On the record before us, it appears

---

[53] In attempting to establish prejudicial error, defendants point to specific items of evidence admitted at trial and portions of the prosecutor's summation, as being irrelevant, serving only to inflame the jurors' passions, raising an impermissible inference of guilt by association, and as urging jurors to infer criminal propensity. In a number of instances, however, defendants did not object on these grounds contemporaneously with the evidence or prosecutorial argument being presented, and we cannot say such objections would have been futile or were unnecessary in light of the trial court's in limine rulings. We question the propriety of allowing evidence and argument to go unchallenged at trial, but then relying on it as support for a claim the trial was grossly unfair. (See *People v. Capistrano*, *supra*, 59 Cal.4th at p. 853 & fn. 7; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 151-152 & fn. 12.)

likely jurors found J.P. to be a credible witness; accepted his duress defense; and concluded Pantoja provided Diaz with the gun, insinuated he should not be afraid to use it, and yelled to him during the attempted carjacking.

Diaz argues the gang evidence prejudiced him because it "overshadowed" his intoxication defense and Marczinski's testimony. He says we must reverse "[u]nless the People can prove beyond a reasonable doubt that no juror would have credited the intoxication defense absent the [trial court's] error [in refusing to bifurcate]." This assumes prejudice; it does not establish it. "[D]efendant must show joinder *actually resulted* in 'gross unfairness,' amounting to a denial of due process. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 836, italics added.) "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient. [Citation.]" (*People v. Johnson* (1988) 47 Cal.3d 576, 591.) It would be sheer conjecture to conclude the trial court's refusal to bifurcate the gang enhancement allegations resulted in jurors rejecting the notion Diaz blacked out or was incapable of forming the requisite specific intent due to intoxication, because the gang evidence led them to punish Diaz for being a gang member.

"Defendants are constitutionally entitled to a fair trial, not one that gives them the best possible chance for an acquittal. An essential goal of a trial is that the fact finder determine what happened through a fundamentally fair and reliable process. As [the California Supreme Court] stated in the analogous circumstance of joinder of charges, 'the benefits of joinder are not outweighed — and severance is not required — merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 381-382.)

Defendants cite *Albarran*, *supra*, 149 Cal.App.4th 214, in which the appellate court found that the admission of gang evidence violated due process and rendered the trial fundamentally unfair. (*Id*. at p. 232.) The court explained: "Certain gang evidence,

namely the facts concerning the threat to police officers, the Mexican Mafia evidence and evidence identifying other gang members and their unrelated crimes, had no legitimate purpose in this trial. The trial court's ruling on the new trial motion in which it broadly concluded the gang evidence was admissible to prove motive and intent for the underlying charges was arbitrary and fundamentally unfair. . . . [T]he prosecution did not prove that this gang evidence had a bearing on the issues of intent and motive. We thus discern 'no permissible inferences' that could be drawn by the jury from this evidence. [Citation.] From this evidence there was a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished. Furthermore, this gang evidence was extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues. In our view, looking at the effect of this evidence on the trial as a whole, we believe that this prejudicial gang evidence was ' "of such quality as necessarily prevents a fair trial." ' [Citation.]" (*Id*. at pp. 230-231, fns. omitted.)

We are not blind to the prosecutor's overproving his case by presenting certain evidence concerning the Nuestra Familia and other gang members and their unrelated crimes, beyond what was necessary to prove the predicate offenses required to establish the existence of a criminal street gang, or by Mariscal's apparent attempt to create an "us versus them" atmosphere by referring to gangs thriving in "our" neighborhoods. Nevertheless, even if we assume no permissible inferences could have been drawn by the jury from some of the evidence, we do not find the gang evidence to have been extremely

50.

and uniquely inflammatory, such that jurors' exposure to it had to have clouded their resolution of the issues.[54]

As we have explained, some gang evidence would have been properly admitted even if bifurcation of the gang enhancement allegations had been ordered. We cannot say evidence of gang benefit was wholly lacking, nor can we say the nature and quantity of the evidence was such that it must have affected jurors' resolution of the substantive issues. In sum, and in contrast to *Albarran*, this case does *not* "present[] one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered [defendants'] trial fundamentally unfair." (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

## B.     Denial of New Trial Motions

Diaz contends that, for the same reasons most of the gang evidence admitted at trial assertedly violated his due process rights in connection with the trial court's refusal to bifurcate, that evidence should have been excluded under Evidence Code section 352. He says its admission violated his right to a fair trial, because jurors could only draw from it the impermissible inference Diaz had a criminal propensity. Accordingly, he says, the trial court should have granted Diaz's motion for a new trial, and its failure to do so requires reversal. Pantoja joins in the argument. We find no cause for reversal.

### 1.     Background

Pantoja moved for a new trial, in part on the ground that the gang evidence presented by the prosecution "unduly and irremediably" prejudiced his jury against him, made it more likely the jury would believe he had a bad character, and made it more likely the jury would decide he committed the substantive offenses. Pantoja listed

---

[54]     Significantly, in *Albarran*, there were problems with the eyewitness identifications of Albarran as one of the perpetrators (see *Albarran*, *supra*, 214 Cal.App.4th at pp. 218-219 & fn. 2) that did not exist in the present case.

51.

numerous errors he claimed were committed in admitting specified gang-related evidence and prosecutorial argument.

Diaz also moved for a new trial, on the ground the verdicts were the product of improperly admitted evidence. He asserted the prosecution evidence related to his delinquent history and association with members of a violent street gang "was largely redundant, irrelevant, prejudicial, and inadmissible," in violation of various of his federal constitutional rights, and that the nature and volume of the evidence served only to impermissibly demonstrate his criminal disposition. Diaz listed the evidence and prosecutorial argument as to which he claimed error. Relying primarily on *Albarran*, *supra*, 149 Cal.App.4th 214 and *People v. Memory* (2010) 182 Cal.App.4th 835 (*Memory*), Diaz argued the improperly admitted gang evidence created a strong likelihood of affecting the verdict on the underlying counts.[55] Diaz argued that even if there would have been sufficient evidence to sustain a true finding on the gang enhancement allegations, the "sheer volume of inadmissible superfluous evidence" still tainted the verdicts. He argued that evidence should have been excluded, either because it was more prejudicial than probative, or because it was testimonial hearsay, or for both reasons. Pantoja joined in Diaz's motion.

---

[55]   In *Albarran*, the jury found the gang enhancement allegations true, but the trial court granted a new trial as to the enhancements after finding insufficient evidence. The appellate court held Albarran should have been granted a new trial on all charges, given the introduction at trial of "extremely prejudicial" gang evidence that was not relevant to the underlying charges. (*Albarran*, *supra*, 149 Cal.App.4th at p. 217.) In *Memory*, no gang enhancements were alleged, but the trial court allowed the prosecution to introduce gang-type evidence regarding the motorcycle club to which the defendants belonged, despite the lack of foundation the group was a gang or criminal enterprise. The appellate court found the evidence was not probative of motive, but instead was used to show the defendants' criminal disposition. Because the defense relied on credibility determinations, the court found it reasonably probable the defendants would have achieved a better result on all charges had the irrelevant, inflammatory evidence, which harmed the defendants' credibility and provided evidence of their criminal disposition, not been admitted. (*Memory*, *supra*, 182 Cal.App.4th at pp. 838-839.)

The People opposed both motions. After argument, the trial court stated it felt a "fair summary" of *Albarran* was that if there was a substantive crime with a gang enhancement, and the jury found the enhancement not true, the court had to take "a good hard look" at the underlying crime and whether the evidence as to that crime was sufficient under federal due process/fundamental fairness standards. The court noted that in *Albarran*, originally there was no identification, then there was suspect identification. Albarran presented alibi testimony from friends and family members, making his participation in the crime a critical issue. In the present case, in contrast, there was the testimony of J.P., Kellie Sample, and Hatfield. More importantly, there was video evidence of what happened during the evening, and immediately prior to and during the time of the shooting. As a result, the court concluded, the verdicts would have been the same had the gang enhancement allegations been bifurcated, and the juries were able to put aside the "encyclopedic recitation" of the gang evidence. Accordingly, the motions for new trial were denied.

2.     Analysis

"When a verdict has been rendered . . . against the defendant, the court may, upon his application, grant a new trial . . . : [¶] . . . [¶] 5. When the court . . . has erred in the decision of any question of law arising during the course of the trial . . . ." (§ 1181.)

"The trial court is vested with broad discretion to act upon a motion for new trial. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) Thus, generally speaking, " '[w]e review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)[56]

---

[56]     Citing *People v. Ault* (2004) 33 Cal.4th 1250, 1262, the Court of Appeal in *Albarran* reviewed the trial court's order denying the motion for a new trial

53.

"Only relevant evidence is admissible at trial. [Citation.] Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.]" (*People v. Merriman*, *supra*, 60 Cal.4th at p. 74.)

In the present case, some of the gang evidence may well have been excludable as irrelevant or substantially more prejudicial than probative. As we noted earlier, however, timely and specific objections often were lacking. Diaz did file a written in limine motion seeking to limit the gang expert's testimony and to exclude "improper, inadmissible, and prejudicial" testimony by the prosecution's gang experts. Diaz requested an order that the objections made in his written motion, and the trial court's rulings thereon, be deemed to have been made during the course of the trial. However, the only anticipated evidence specified by the motion (in which Pantoja joined) was testimonial hearsay. Defendants also unsuccessfully objected to the prosecutor's use of

---

de novo. (*Albarran*, *supra*, 149 Cal.App.4th at p. 224.) It found independent review to be appropriate because the defendant's federal constitutional rights to due process and the fundamental fairness of his trial were implicated. (*Id.* at pp. 224-225, fn. 7.) In so doing, however, it relied on cases in which the new trial motion was brought on grounds of juror misconduct. (See, e.g., *Ault*, *supra*, 33 Cal.4th at p. 1255; *People v. Nesler* (1997) 16 Cal.4th 561, 565 (lead opn. of George, C.J.).) We question whether the de novo standard of review extends to new trial motions not involving allegations of juror misconduct. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 809; *People v. Collins* (2010) 49 Cal.4th 175, 242 & fn. 31; cf. *People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27 [abuse of discretion standard applied to new trial motion brought on constitutional grounds of asserted violations of *Brady v. Maryland* (1963) 373 U.S. 83 and right to effective assistance of counsel], overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920 & *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 637-643.) In any event, our conclusion would be the same were we to review the trial court's ruling de novo.

54.

Plympton's conviction, arising out of the Circle K incident, as a predicate act. There were also objections raised with respect to the MySpace page and link to the video of the Circle K incident, as well as to tattoos that were visible on Diaz's biological father and photographs found in the residence of Diaz's mother. We question whether these and the other, relatively few relevance and Evidence Code section 352 objections made at trial to specific testimony, are sufficient to allow new trial motions based on admission of the myriad pieces of gang evidence enumerated in defendants' motions. (See Evid. Code, § 353; *People v. Abel* (2012) 53 Cal.4th 891, 924; *People v. Lindberg* (2008) 45 Cal.4th 1, 47-48; *People v. Holford* (2012) 203 Cal.App.4th 155, 169-170; cf. *Memory*, *supra*, 182 Cal.App.4th at pp. 856-857.)

In any event, for the same reasons we found no due process violation in conjunction with denial of defendants' motion to bifurcate the gang enhancement allegations, *ante*, we find none here. Even assuming some of the gang-related evidence should have been excluded under Evidence Code section 352, its admission did not render defendant's trial fundamentally unfair, as required to establish a due process violation. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439; *Albarran*, *supra*, 149 Cal.App.4th at p. 229.) Nor, in light of the properly admitted evidence and instructions to both juries that the gang evidence could not be used to infer bad character or criminal disposition, is it reasonably probable either defendant would have obtained a more favorable result absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Williams*, *supra*, 170 Cal.App.4th at pp. 612-613; see *People v. Homick*, *supra*, 55 Cal.4th at pp. 866-867; *People v. Foster* (2010) 50 Cal.4th 1301, 1332.) Accordingly, the trial court correctly denied defendants' new trial motions.

Diaz says that at the very least, we must reverse the jury's true finding on the section 12022.53, subdivisions (d) and (e)(1) enhancement, since it required the jury to find the gang enhancement true. He argues that given the "highly inflammatory" gang

55.

evidence, the jury's true finding on the firearm enhancement allegations likely resulted from a compromise "designed to punish Diaz for his association with the violent Norteño gang and for his criminal propensity." He says that given the inconsistent verdict, the People cannot disprove this possibility beyond a reasonable doubt.

We will discuss issues concerning the section 12022.53 enhancement, *post*. At this point, it is sufficient to observe that inherently inconsistent verdicts and findings are allowed to stand. (*People v. Panah* (2005) 35 Cal.4th 395, 490.) Because we have concluded there was no due process violation, the People are not required to disprove anything beyond a reasonable doubt in order to dispel prejudice. Moreover, we reject Diaz's conjecture that jurors sought to punish him for his gang involvement and criminal disposition. Had jurors been swayed in that manner by the gang evidence, they would not have rebuffed the gang enhancement allegations and instead would have found them to be true. Rather, we think it likely jurors found the firearm enhancement true because the evidence conclusively proved Diaz was the shooter.

## C. __Admission of Testimonial Hearsay__

Defendants contend, both separately and by joining in the other's claim, the trial court erred by permitting Berry and Mariscal, the prosecution's gang experts, to present testimonial hearsay to the jury. The Attorney General argues any error was harmless. We agree with the Attorney General.

### 1. Background

As previously noted, Diaz moved, in limine, to preclude the prosecution's gang experts from offering opinions based on testimonial hearsay, in violation of Diaz's Sixth Amendment rights to confront and cross-examine witnesses. He argued the California Supreme Court's opinion in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), which allowed such evidence, did not survive *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Williams v. Illinois* (2012) 567 U.S. 50 (*Williams*). Pantoja joined. The

People opposed the motion, arguing the materials relied on by the gang experts in this case were admissible under *Williams*.

At the hearing on the motion, counsel for Diaz stated he was not objecting to all hearsay, only to that deemed to be testimonial under *Crawford* and its progeny. The prosecutor took the position *Williams* did not apply, and the confrontation clause did not prohibit testimony of an expert that was based on the work of another. The court determined *Gardeley*, which permitted gang experts to rely on reliable hearsay in rendering their opinions, controlled. The court stated it had reviewed the preliminary hearing and other transcripts, and found most of the basis evidence was not testimonial in any event. After further argument, the court determined it was bound by *Gardeley*.

Fairly early in Mariscal's testimony, the prosecutor asked about "debriefs" of Norteño gang members Mariscal had conducted, and whether they comported with what he personally had seen in investigating crimes. Counsel for Diaz renewed his objection and asked that it be a continuing one. The trial court granted the request for a continuing objection, but overruled it for the reasons stated earlier.

Diaz's subsequent new trial motion was based, in part, on the admission of assertedly testimonial hearsay. Diaz pointed to Mariscal's testimony about various police reports written by someone other than Mariscal (which Diaz enumerated), based on which Mariscal opined J.P. was a Norteño associate and defendants were active members. As previously stated, the motion was denied.

2. Analysis

Under *Crawford*, "[t]he admission of testimonial statements offered against a defendant violates the Sixth Amendment confrontation clause unless the witness who made the statement is unavailable at trial *and* the defendant had a prior opportunity for cross-examination. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 249, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19.) "Various formulations of [the] core class of 'testimonial' statements exist: '*ex*

57.

*parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Crawford*, *supra*, 541 U.S. at pp. 51-52.)

At the time of trial, California Supreme Court precedent permitted the type of expert testimony at issue in the present case. (*Gardeley*, *supra*, 14 Cal.4th at pp. 617-620.) Questions had been raised, however, concerning the continuing validity, post-*Crawford*, of the notion evidence forming the basis of an expert's opinion was not offered for its truth. (See, e.g., *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1131.)

After trial, but while defendants' appeals were pending, the California Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).[57] In that case, the state high court observed that "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez*, *supra*, at p. 676.) "By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) The court determined that in light of state hearsay rules and *Crawford*, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the

---

[57] The Attorney General "assume[s], without conceding," that *Sanchez* applies retroactively to cases pending on direct appeal. Since the Attorney General does not further discuss retroactivity, we will also assume, without further discussion, that *Sanchez* applies on this appeal.

58.

statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception?  If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez*, *supra*, at p. 680.)[58]

After examining United States Supreme Court and California authorities, the California Supreme Court "adopt[ed] the following rule:  When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. omitted.)  The court cautioned that it was not calling into question "the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Id*. at p. 685.)  "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code.  They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven.  They may also rely on nontestimonial hearsay properly

---

**58**    *Sanchez* disapproved *Gardeley*, *supra*, 14 Cal.4th 605, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13.)  It also disapproved a number of its prior decisions that had concluded an expert's basis testimony is not offered for its truth.  (*Ibid*.)

admitted under a statutory hearsay exception." (*Ibid*.) An expert may still rely on hearsay in forming an opinion, "and may tell the jury *in general terms* that he did so." (*Ibid*.) What experts "cannot do is present, as facts, the content of testimonial hearsay statements." (*Ibid*.)

We review de novo a claim the admission of evidence violated a defendant's Sixth Amendment confrontation right. (*People v. Hopson* (2017) 3 Cal.5th 424, 431.) Because the issue was fully litigated in limine and a continuing objection was granted during trial, the People, as the proponent of the evidence, had the burden to show its experts were not relating testimonial hearsay. (See *People v. Ochoa* (2017) 7 Cal.App.5th 575, 584; see also *Idaho v. Wright* (1990) 497 U.S. 805, 816, abrogated in part by *Crawford*, *supra*, 541 U.S. at pp. 60-62; *People v. Johnson* (2015) 61 Cal.4th 734, 761.)[59]

We agree with defendants that the prosecution's gang experts conveyed some evidence to the juries that either clearly was testimonial hearsay or that, because of the trial court's erroneous ruling admitting the evidence over defendants' objections, the People did not show was not testimonial. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 694, 697; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248-1251; but see *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 408-409; *People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36.) Nevertheless, we conclude admission of the testimonial hearsay did not prejudice defendants.

"Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show 'beyond a reasonable doubt' that the error was harmless. [Citations.]" (*People v. Rutterschmidt*

---

[59] Pantoja raises an ineffective-assistance-of-counsel claim in the event we find the issue forfeited as to him. Since he joined in Diaz's motion to exclude the challenged evidence and any further objection by either defendant would have been futile, there was no forfeiture. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1291.) Accordingly, we do not reach Pantoja's alternative argument.

(2012) 55 Cal.4th 650, 661, quoting *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see, e.g., *Sanchez*, *supra*, 63 Cal.4th at p. 699; *People v. Lucas*, *supra*, 60 Cal.4th at p. 249.) Here, neither jury returned true findings on the gang enhancement allegations. There was properly admitted gang evidence, including but not limited to J.P.'s testimony, showing both defendants' relationship to the Norteño criminal street gang. The record contains no suggestion the improperly admitted gang evidence carried over into, or adversely affected, jurors' determination of defendants' guilt on the underlying offenses. (See *People v. Jones*, *supra*, 57 Cal.4th at p. 927.) We do not read *Chapman* review as requiring the People to disprove every conceivable notion, no matter how conjectural.

### E.     Diaz's Booking Admission

Diaz contends the trial court erred, and violated Diaz's Fifth Amendment rights, by allowing evidence of an admission of gang affiliation Diaz made in response to a booking question. The Attorney General concedes the error but says it was harmless. Again, we agree with the Attorney General.

#### 1.     Background

A question arose during trial about the admissibility of Diaz's classification when he was booked into juvenile hall for vehicle theft. The trial court opined such evidence was admissible pursuant to *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*), but afforded Diaz's counsel the opportunity to examine the probation officer who took the information concerning whether such questions were a necessary part of the juvenile hall booking process. Outside the presence of both juries, that probation officer testified gang affiliation questions were routinely asked of every minor booked into juvenile hall for a felony. Such questions were asked for safety reasons, so that members of rival gangs were not housed in the same cell. At the conclusion of the testimony, and following argument, the trial court ruled that Mariscal could use Diaz's admission of association in his testimony and his opinions.

Mariscal subsequently testified to Diaz's arrest, on May 1, 2010, for vehicle theft. Mariscal related that when Diaz was being booked at juvenile hall for the offense, he admitted that he associated with Northerners and did not want to be housed with Sureños. This constituted a "classification admit" and so satisfied one of Mariscal's criteria for documenting someone as a gang member.

2.      Analysis

"Under the rule of *Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 (*Miranda*), certain admonitions must be given before a suspect's statement made during custodial interrogation can be admitted in the prosecution's case-in-chief." (*People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*).) "[C]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444, fn. omitted.) " '[I]nterrogation' " means express questioning or its functional equivalent, to wit, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301, fns. omitted (*Innis*).) An incriminating response is any response, whether inculpatory or exculpatory, the prosecution may seek to introduce at trial. (*Id*. at p. 301, fn. 5.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582, a plurality of the United States Supreme Court recognized "a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Citation.]" (*Id*. at p. 601 (plur. opn. of Brennan, J.).) The court cautioned that " 'recognizing a "booking exception" to *Miranda* does not mean . . . that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions,

62.

even during booking, that are designed to elicit incriminatory admissions.' [Citations.]" (*Id*. at p. 602, fn. 14.)

At the time of trial in the present case, application of the booking question exception to booking interview questions and answers about gang affiliation was not completely settled, although such questions and answers generally were found to fall within the purview of the exception. As the Court of Appeal explained in *Gomez*, *supra*, 192 Cal.App.4th 609: "[W]hether a question about a suspect's gang affiliation during a booking interview is encompassed by the booking question exception depends upon whether, under all the facts and circumstances, the question was designed to elicit an incriminating response." (*Id*. at p. 627.) Under the factors suggested by *Gomez* for consideration in determining whether questions are legitimate booking questions or a pretext for eliciting incriminating information (*id*. at pp. 630-631), the challenged questions and answers here were admissible.

After defendants' trial was concluded, however, the California Supreme Court disapproved *Gomez*. (*Elizalde*, *supra*, 61 Cal.4th at p. 538, fn. 9.) In *Elizalde*, the state high court found routine questions about gang affiliation posed during booking "exceeded the scope of the [booking] exception and . . . officers should have known these questions were reasonably likely to elicit an incriminating response because of California's criminal gang statutes and defendant's pending charges. While officers were permitted to ask these questions for institutional security purposes, defendant's un-*Mirandized* responses were inadmissible against him during the [prosecution's] case-in-chief." (*Id*. at p. 527.)

In Diaz's case, in contrast to the situation in *Elizalde*, the booking occurred at juvenile hall, the person asking the questions was a probation/corrections officer rather than a sheriff's deputy, and Diaz's vehicle theft charge carried with it no gang allegations. (Cf. *Elizalde*, *supra*, 61 Cal.4th at p. 529.) Nevertheless, as the Attorney General concedes, it was error to admit, in the prosecution's case-in-chief, evidence of

63.

Diaz's gang affiliation elicited during a booking interview that was not shown to have followed Diaz's advisement and waiver of rights under *Miranda*.[60]

We turn, then, to the question of prejudice. The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment/*Miranda* is assessed under the beyond-a-reasonable-doubt standard of *Chapman*, *supra*, 386 U.S. 18. "That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*Elizalde*, *supra*, 61 Cal.4th at p. 542.) Contrary to Diaz's claim, the error in admitting a single booking response had no conceivable effect on the jury's verdicts. Accordingly, Diaz is not entitled to reversal of the judgment.

**E.    Admission of Evidence of Circle K Beating and Drive-By Shooting**

Pantoja contends that even if the gang enhancement allegations were properly joined with the underlying charges (as we have found), the trial court abused its discretion under Evidence Code section 352 by admitting evidence of Pantoja's involvement in the Circle K beating and subsequent drive-by shooting. He says the error violated his right to a fair trial. Diaz joins in the argument "[i]nsofar as [it] raises any legal points not raised in Diaz's opening brief . . . ." The Attorney General argues the claim was forfeited for failure to object, and Pantoja has failed to establish ineffective assistance of counsel. We find no cause for reversal.

1.    Background

During in limine proceedings, Pantoja moved that there be no references to the MySpace account bearing his name, absent a foundation showing the page was truly tied to him. Beyond the issue of authentication, Pantoja argued the Circle K video linked on the page might form some basis for the gang experts to opine Pantoja was a Norteño, but

---

[60]    Where *Miranda* is concerned, the prosecution bears the burden of establishing the requisite admonishment of rights was given and understood, and that the rights were voluntarily and intelligently waived. (*Miranda*, *supra*, 384 U.S. at p. 444.)

it did not prove anything about what happened at ampm. Pantoja concluded that if the court felt the MySpace account information and images should be put in front of the jury, then the evidence was more prejudicial than probative pursuant to Evidence Code section 352. The court took the motion under submission.

When the motion was revisited, the prosecutor argued the MySpace page was relevant to show, through Mariscal's expected testimony, benefit to the gang. The prosecutor pointed out there were no overt gang words or phrases at the time of the Bettencourt shooting, but that Mariscal testified at the preliminary hearing that the posting of something like the Circle K video on social media was a way of boasting and bragging about gang members' crimes and of publically displaying the violence of the gang. The prosecutor asserted that if the MySpace page was excluded, Mariscal would give the same opinion about how the gang's reputation is bolstered through bragging and notoriety, but that Mariscal's opinion might be considered speculation without foundation. Pantoja represented he was not contesting the fact he was a Norteño, and he was willing to stipulate to that, as well as to the fact part of what Norteños do is to tell the world they are Norteños. Pantoja argued Mariscal did not need the MySpace page to say "that is what Norteños do," and that Mariscal could use a MySpace page that did not reference Pantoja. Pantoja argued the images on the MySpace page would be "horrifying" to jurors not accustomed to seeing gang images. He argued it was not necessary and would be substantially more prejudicial than probative. He also argued that if Mariscal was going to be allowed to bring in the Circle K incident as a gang act, neither the MySpace page nor any reference to a video was necessary. Pantoja suggested the prosecutor would present the MySpace page as evidence Pantoja was guilty of something.

The prosecutor pointed out that the jury would be instructed on the purpose of gang evidence, and told how it could and could not be used. The prosecutor reiterated that the purpose of the evidence was not to show Pantoja was a gang member, but as

foundation for Mariscal's opinion concerning gang benefit with respect to the Bettencourt shooting. The prosecutor argued the evidence was crucial, and, since the prejudicial effect was about equal to the probative value, the defense analysis under Evidence Code section 352 failed. The prosecutor represented the MySpace page would only be used for Mariscal's opinion, as it bolstered the opinion that gangs brag and that they have to brag about crimes to become notorious.

Pantoja argued that Mariscal could use a MySpace page for that purpose that did not bear Pantoja's name. He also argued that he expected Mariscal and an officer from Redding to testify concerning the Circle K incident, but that the MySpace page was not needed and was a way for the prosecutor to tell the jury Pantoja acted badly before and so probably was a murderer today. The prosecutor disputed that notion, and noted the Circle K beating was going to be a predicate act. Pantoja requested that if any of the MySpace page was allowed, it should only be that which was absolutely necessary for Mariscal. The court agreed.

Later in the trial, Pantoja renewed his objection "to any use of the MySpace account that [was] talked about in limine." It was determined McQueary would be permitted to testify that he accessed the MySpace page bearing Pantoja's name. Pantoja also asked that the video not be played, and that it not be mentioned by McQueary, although he acknowledged Mariscal was going to talk about it in his testimony. The prosecutor responded that it was important to Mariscal that Pantoja put a link to the Circle K video on MySpace. Counsel for Pantoja agreed that testimony in that regard could come from Mariscal, without the playing of the video. He also agreed the prosecutor could establish, through McQueary, that there was a link to a video on the MySpace page, and that McQueary was able to play the video through the link.

During the trial testimony, counsel for Pantoja objected, on grounds of speculation, lack of foundation, hearsay, and not within the purview of an expert, to Berry's testimony concerning the drive-by shooting that occurred about an hour after the

Circle K beating. Upon clarification that Berry was describing his personal investigation, counsel withdrew his objection. On cross-examination, counsel for Pantoja elicited that the victim was unable to say who actually shot at him, and that no shot struck him or his vehicle. Berry and other investigators never found any physical evidence the shooting took place. When Berry interviewed Pantoja after the latter's apprehension, Pantoja talked about knowing he was a suspect in the Circle K incident and the ampm shooting, but never said he took part in the shooting after the Circle K incident.

During Mariscal's testimony, counsel for Pantoja objected to testimony concerning the MySpace page on the ground there was no foundation it was actually authored by Pantoja. The court reiterated its ruling that there was sufficient evidence of reliability to allow the MySpace page to be presented to the jury. Counsel for Diaz then argued the page was accessed after the charged offenses, which allowed an opportunity for someone to brag about those offenses, but no one did. The court found that the MySpace page showed at least one defendant bragging, which was within the scope of the question even though no one was charged with that offense in this case. Accordingly, it overruled the objection.

Mariscal subsequently listed the Circle K incident as one of a number of incidents he took into account when determining whether Pantoja met Mariscal's gang criteria. Later, when given hypothetical facts based on the evidence and asked whether the killing of the passenger conferred a benefit on the Norteño gang, Mariscal opined that it did, as the more violent the crime, the more violent reputation and power the gang could achieve. Mariscal also noted that the hypothetical involved the other two gang members joining in and reinforcing the gang's rules. As an example, Mariscal pointed to Pantoja's own criminal history, in which Pantoja was outside Circle K, but reentered the store and started beating the rival gang member because his fellow gang member had started it. Counsel for Pantoja objected that the testimony assumed facts not in evidence concerning

67.

Pantoja's reason and intent. Mariscal was then asked to limit his response to the evidence that the co-responsible began the assault and Pantoja joined in within seconds.

In his new trial motion, Pantoja asserted the trial court erred by allowing the prosecution to present evidence or argue, inter alia, that Plympton and/or the Circle K assault were related to Pantoja, there was a video link on the alleged Pantoja MySpace page connected to that assault, there was a warrant out for Pantoja connected to that assault, and Pantoja was arrested in connection with that assault. As previously stated, the motion was denied.

2.     Analysis

"Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome [citation]." ' [Citation.] On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion. [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)

We need not decide whether evidence of Pantoja's involvement in the Circle K beating and subsequent drive-by shooting was substantially more prejudicial than probative, because Pantoja failed to object on the grounds he now seeks to raise. "A defendant who fails to make a timely objection or motion to strike evidence may not later claim that the admission of the evidence was error [citations] or that the prosecutor committed misconduct by adducing it [citation]. Further, '[w]hen an objection is made to proposed evidence, the specific ground of the objection must be stated. The appellate court's review of the trial court's admission of evidence is then limited to the stated ground for the objection. (Evid. Code, § 353.)' [Citation.] 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded,

68.

so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.  If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial.  A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.'  [Citation.]" (*People v. Abel*, *supra*, 53 Cal.4th at p. 924.)

In the present case, as shown by the summary above, the objections actually made by Pantoja at trial were on different grounds than, and so were insufficient to preserve for appeal, the claims he now makes.  Accordingly, these claims have been forfeited (see, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 129-130; *People v. Letner and Tobin*, *supra*, 50 Cal.4th at pp. 159-160 [in limine motion insufficient]; *People v. Doolin*, *supra*, 45 Cal.4th at p. 433; *People v. Lindberg*, *supra*, 45 Cal.4th at pp. 47-48 [objection to admission of expert's testimony as whole insufficient]; *People v. Partida*, *supra*, 37 Cal.4th at pp. 435-436 [due process claim]) and so will not be reviewed (*People v. Clark* (1992) 3 Cal.4th 41, 125-126, overruled on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 461-462; see Evid. Code, § 353).  Any claim the prosecutor impermissibly argued the Circle K beating and drive-by shooting as propensity evidence (see *People v. Guerrero* (1976) 16 Cal.3d 719, 724) likewise has not been preserved for appeal, as no timely and specific objection on that ground was made at trial (see *People v. Gurule* (2002) 28 Cal.4th 557, 626-627; see also *People v. Pearson*, *supra*, 56 Cal.4th at p. 439).

Not surprisingly, Pantoja says that if his evidentiary claims were forfeited by his trial attorney's failure to object, then Pantoja's Sixth Amendment right to the effective assistance of counsel was violated.  (See *People v. Mitchell* (2008) 164 Cal.App.4th 442, 466 ["the only thing that inexorably follows a finding that an argument on appeal has been forfeited by counsel's failure to object is a claim of ineffective assistance"].)

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 (*Strickland*).)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

"[C]ounsel's decision whether or not to object to [assertedly] inadmissible evidence is a matter of trial tactics. [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 661.) Because of the great deference reviewing courts accord to trial counsel's tactical decisions, "counsel's failure to object rarely provides a basis for finding incompetence of counsel. [Citations.]" (*Ibid.*; see *People v. Farnam* (2002) 28 Cal.4th 107, 148 [tactical errors generally not deemed reversible].)

Given the issues before the juries in the present case, reasonably competent counsel may have decided an objection to Pantoja's involvement in the Circle K beating

would have been futile. "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.) Here, the appellate record sheds no light on why counsel failed to object, and he was not asked to explain his performance. "[A]lthough we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not. Thus, we must reject [Pantoja's] point." (*People v. Bell* (1989) 49 Cal.3d 502, 546, fn. omitted.)

Assuming counsel could have had no satisfactory reason for failing to object — particularly to the evidence of the drive-by shooting — Pantoja fails to establish the requisite prejudice. "Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted . . . , i.e., a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Citation.] Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] 'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 104-105.) We apply this standard even if, had the direct claim of error not been forfeited, it would have been reviewed under the more stringent *Chapman* standard. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008-1009.)

In light of the other evidence and the trial court's instruction prohibiting use of the gang evidence to show disposition or bad character, we find no reasonable probability Pantoja would have obtained a more favorable result had counsel objected to admission of the evidence Pantoja now challenges. Contrary to Pantoja's claim, when the prosecutor's argument is fairly read, it is clear he did not urge jurors to use the evidence

71.

to show propensity.  Nothing in the record suggests jurors used the evidence improperly.  Accordingly, Pantoja's claim fails.[61]

II[*]

**CALCRIM NO. 375**

Pantoja claims the trial court's failure to instruct the jury with CALCRIM No. 375, with respect to J.P.'s testimony concerning the alleged robbery of the ice cream vendor and intended robbery of the two women at the theater, violated his Fourteenth Amendment right to a fair trial.  Diaz joins in the argument.  The Attorney General argues the evidence was not admitted under Evidence Code section 1101, subdivision (b), but rather was J.P.'s recitation of events surrounding, and leading up to, the charged offenses; the prosecutor did not present the evidence; and the trial court had no sua sponte duty to give the instruction and neither defendant requested it.  We conclude the trial court was not required to give a limiting instruction on its own motion, and the alternative claims of ineffective assistance of counsel lack merit.

## A. **Background**

Near the outset of trial, when it was not known whether J.P. would testify, the court and counsel discussed the potential admission of J.P.'s statements concerning events prior to the ampm incident, through Diaz's expert on intoxication.  The court opined that it did not see any reason such statements should come into evidence, but it agreed to read the transcript of J.P.'s un-*Mirandized* statement to the prosecutor and Mariscal, along with Marczinski's report.  After doing so, the trial court ruled Marczinski could testify regarding Diaz's consumption of Four Loko and marijuana without getting into Pantoja's activities.  The court also ruled J.P.'s statement about how Diaz obtained

---

**61**     We question the efficacy of Diaz's joinder.  (See *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 363-364.)  In any event, our analysis and conclusion are the same as to him.

*     See footnote, *ante*, page 1.

the gun could be used, but that J.P.'s statement that he did not see the gun before the event with the ice cream vendor was not relevant to Marczinski's testimony. The prosecutor emphatically asserted he would not be bringing up, in his case-in-chief, the robbery and attempted robbery that, according to J.P., occurred before the ampm incident. The court reiterated that those incidents were irrelevant with respect to the expert testimony, and would not be admitted.

Well after this ruling was made, J.P. decided to testify. His testimony concerning the events that preceded the Bettencourt shooting are summarized in the statement of facts, *ante*, as is the testimony of the defense investigator who could find no evidence an ice cream vendor was robbed. At one point during his examination of J.P., counsel for Pantoja elicited that J.P. was not called as a witness by, or testifying on behalf of, the prosecutor.

## B.  Analysis

In keeping with Evidence Code section 1101, subdivision (b), CALCRIM No. 375 instructs a jury that, where the People have presented evidence the defendant committed uncharged bad acts or offenses, jurors may consider the evidence only if the People proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts or offenses, and to disregard the evidence in its entirety if they did not so find; if jurors found the defendant committed the uncharged acts or offenses, they could consider the evidence for the limited purpose of deciding identity, intent, motive, knowledge, accident, common plan, consent, or another specific purpose; to consider the similarity or lack of similarity between the charged and uncharged acts in evaluating the evidence; not to consider the evidence for any other purpose; not to conclude from the evidence that the defendant had a bad character or was disposed to commit crime; and that a conclusion the defendant committed the uncharged acts or offenses was only one factor to consider, along with all the other evidence, and was not sufficient by itself to

prove the defendant was guilty, but rather that the People must still prove each charge and allegation beyond a reasonable doubt.

No request was made for the instruction in the present case, and it was not given to either jury.

Evidence Code section 355 provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) The California Supreme Court has explained: " 'Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted.' [Citation.] There is a 'possible' narrow exception in the ' "occasional extraordinary case" ' in which the evidence ' "is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." ' [Citation.]" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590; see, e.g., *People v. Cowan* (2010) 50 Cal.4th 401, 479-480; *People v. Collie* (1981) 30 Cal.3d 43, 63-64; *People v. Grant* (2003) 113 Cal.App.4th 579, 591.)

We need not decide whether the evidence at issue here was admitted pursuant to Evidence Code section 1101, subdivision (b) or whether a modified version of CALCRIM No. 375 is appropriate when evidence is presented by a party other than the People. (See *People v. Murtishaw*, *supra*, 51 Cal.4th at p. 590; *People v. Homick*, *supra*, 55 Cal.4th at p. 865.) Neither defendant requested that CALCRIM No. 375 be given, and the court had no duty, under the circumstances of this case, to give such a limiting instruction without request (see, e.g., *People v. Valdez*, *supra*, 55 Cal.4th at p. 139; *People v. Jones* (2003) 30 Cal.4th 1084, 1116; cf. *People v. Willoughby* (1985) 164 Cal.App.3d 1054, 1067) or to modify the pattern instruction, on its own initiative, so as to refer to evidence presented other than by the People (see *People v. Jackson* (2016) 1 Cal.5th 269, 351). Accordingly, "the failure to request [CALCRIM No. 375] or similar

limiting instruction as to prior acts or offenses constitutes a waiver to have such an instruction given. [Citations.]" (*People v. Harris* (1977) 71 Cal.App.3d 959, 966.)

Pantoja says that if trial counsel forfeited the issue, he rendered ineffective assistance. The applicable law is set out, *ante*. Here, counsel was not asked for an explanation, and we cannot say there could have been no satisfactory one. For instance, counsel reasonably could have preferred to use the evidence himself in order to attack J.P.'s credibility, as he did in his case-in-chief through the presentation of Wallace's and other testimony and in his summation to the jury. (See, e.g., *People v. Sánchez* (2016) 63 Cal.4th 411, 460; *People v. Benavides* (2005) 35 Cal.4th 69, 94.) Similarly, since J.P. testified before both juries, counsel for Diaz reasonably could have preferred to take advantage of Pantoja's attack on J.P.'s credibility. In any event, our inability to say, on the record before us, that there could be no satisfactory explanation for either counsel's failure to request the giving of a limiting instruction, means defendants' ineffective-assistance-of-counsel claims fail. (*People v. Kipp*, *supra*, 18 Cal.4th at p. 367.)

# III[*]

## CUMULATIVE PREJUDICE

Defendants claim the cumulative effect of the foregoing alleged trial errors denied them their federal constitutional right to a fair trial. We have found many claims of error forfeited for failure to lodge a timely and specific objection in the trial court. To the extent the claims were not forfeited, we have found either no error or no prejudice. Our finding in this regard does not change when any meritorious claims are considered cumulatively. Defendants are not entitled to reversal under either the *Chapman* or the *Watson* standard. (See *People v. Tully* (2012) 54 Cal.4th 952, 1061; *People v. Abel*, *supra*, 53 Cal.4th at p. 936; see also *People v. Jones*, *supra*, 57 Cal.4th at p. 927.)

---

[*]    See footnote, *ante*, page 1.

## COUNT II AS LESSER INCLUDED OFFENSE OF COUNT I

Defendants and J.P. were charged, in count I of the information, with murder committed "willfully, unlawfully, and feloniously and with malice aforethought," in violation of section 187, subdivision (a). Count II charged them with attempted carjacking, in violation of sections 215, subdivision (a) and 664. With respect to count I, the trial court instructed, insofar as is pertinent, on felony murder based on attempted carjacking and on murder with malice aforethought. The prosecutor stated to Diaz's jury that his theory of the case was that there was an attempted carjacking, and someone was killed, making it felony murder. The jury convicted Diaz of murder and attempted carjacking. In its verdict on count I, the jury expressly found the murder was committed during the commission of an attempted carjacking and therefore was murder in the first degree.

Diaz now contends his conviction on count II must be vacated, because attempted carjacking is necessarily included in the felony murder charged in count I. We disagree.

"While section 654 prohibits multiple *punishment*, it is generally permissible to *convict* a defendant of multiple charges arising from a single act or course of conduct. [Citations.]" (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) "Section 954 generally permits multiple conviction." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 (*Reed*).) "When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]" (*Ibid*.)[62]

---

[62] Diaz was sentenced to consecutive terms on counts I and II. He does not now claim that, assuming multiple convictions were proper, multiple punishment was not.

The information alleged Bettencourt as the victim of the murder charged in count I, and Bettencourt and "**JOHN DOE**" – i.e. Gomez – as the victims of the attempted carjacking charged in count II. The jury's verdicts found Diaz guilty as charged in the information. Section 654 does not bar separate punishment when an act of

"A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.]" (*Reed*, *supra*, 38 Cal.4th at p. 1227.) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.] If neither offense is necessarily included in the other, the defendant may be convicted of both . . . ." (*People v. Sanders*, *supra*, 55 Cal.4th at p. 736.)

"There are two tests for determining whether one offense is necessarily included in another: the 'elements' test and the 'accusatory pleading' test. [Citation.] We apply the 'elements' test here because this case involves the conviction of multiple . . . *charged* offenses. 'Courts should consider [both] the statutory elements and accusatory pleading in deciding whether a defendant received notice, and therefore may be convicted, of an *uncharged* crime, but only the statutory elements in deciding whether a defendant may be convicted of multiple *charged* crimes.' [Citation.] Under the 'elements' test, we look strictly to the statutory elements, not to the specific facts of a given case. [Citation.] We inquire whether all the statutory elements of the lesser offense are included within those of the greater offense. In other words, if a crime cannot be committed without also committing a lesser offense, the latter is a necessarily included offense. [Citations.]" (*People v. Ramirez* (2009) 45 Cal.4th 980, 984-985.)

It is self-evident that murder can be committed without the commission of attempted carjacking. "Murder is the unlawful killing of a human being, or a fetus, with

violence is committed against multiple victims. (*People v. Newman* (2015) 238 Cal.App.4th 103, 114-115 & cases cited therein.) Murder is a crime of violence (*People v. Jackson*, *supra*, 1 Cal.5th at p. 354), as is attempted carjacking (see *People v. Capistrano*, *supra*, 59 Cal.4th at p. 887). The present case involved both separate acts of violence (the aiming of the gun at Gomez's face accompanied by a demand for his car keys; the shooting of Bettencourt) and separate victims.

malice aforethought." (§ 187, subd. (a).) " 'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) Accordingly, count II is not an offense necessarily included in count I. This is true even if we consider first degree murder, since a killing committed in the perpetration or attempted perpetration of carjacking is only one of multiple means by which a murder is first, rather than second, degree under section 189.

Diaz contends that attempted carjacking is necessarily included within *felony murder*. He argues that when determining whether a defendant has been convicted of a necessarily included offense, we must apply the statutory elements test to the offense of which the defendant actually was convicted, and not to alternative theories of liability that were not presented to or found by the jury. Diaz is wrong.

As support for his argument, Diaz points to *People v. Dillon* (1983) 34 Cal.3d 441, 475-477 and footnote 23, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1185-1186. In *Dillon*, Justice Mosk, writing for a plurality of the state high court, took the position that in California, felony murder and premeditated malice murder are not the same crimes. The California Supreme Court has since explained, however, that this "means only that the two forms of murder have different elements even though there is but a single statutory offense of murder. [Citations.]" (*People v. Abel*, *supra*, 53 Cal.4th at p. 937; see, e.g., *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479 [premeditated murder and felony murder are alternative theories of liability, not distinct crimes]; *People v. Box* (2000) 23 Cal.4th 1153, 1211 [felony murder and premeditated murder constitute two kinds of first degree murder requiring different elements of proof], disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.)

Diaz also relies heavily on *Whalen v. United States* (1980) 445 U.S. 684 (*Whalen*) and *People v. Wader* (1993) 5 Cal.4th 610.  Neither opinion assists him, as both concern the issue of when multiple *punishments* violate the double jeopardy clause of the United States Constitution.  (*Whalen*, *supra*, 445 U.S. at pp. 686, 690-693; *People v. Wader*, *supra*, 5 Cal.4th at p. 670.)  Neither suggests, in any way, shape, or form, that their discussions in this regard extend to the propriety of multiple *convictions*.  It is axiomatic that a decision is not authority for propositions not considered or decided.  (E.g., *People v. Toro* (1989) 47 Cal.3d 966, 978, fn. 7, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)

In reaching its conclusion that multiple *punishment* was not permitted, under the laws enacted by Congress for the governance of the District of Columbia or by the double jeopardy clause of the federal Constitution, for felony murder and the underlying felony, *Whalen* looked to whether Congress authorized the imposition of consecutive sentences.  (*Whalen*, *supra*, 445 U.S. at p. 689.)  It determined Congress intended the federal courts to adhere to the test of *Blockburger v. United States* (1932) 284 U.S. 299, 304 (*Blockburger*), to wit:  " '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.' [Citations.]" (*Whalen*, *supra*, 445 U.S. at p. 691.)  The *Whalen* court stated: "In this case, resort to the *Blockburger* rule leads to the conclusion that Congress did not authorize consecutive sentences for rape and for a killing committed in the course of the rape, since it is plainly not the case that 'each provision requires proof of a fact which the other does not.'  A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape. [Citations.]" (*Id.* at pp. 693-694.)

It is true, as Diaz contends, that the Supreme Court rejected the government's claim that felony murder and rape were not the same offense under *Blockburger* because felony murder could involve proof of a felony other than rape.  Again, however, it did so

solely in the context of the propriety of multiple punishments.  (*Whalen*, *supra*, 445 U.S. at p. 694 & fn. 8.)  It also observed that Congress was free to fashion exceptions to its rule of statutory construction that was based on *Blockburger*.  (*Whalen*, *supra*, 445 U.S. at pp. 691, 695.)

Nothing in the cases cited to us, or those we have found through our own research, suggests to us that Diaz's conviction for attempted carjacking should be vacated.  Rather, we conclude both convictions must stand.

# V[*]

## <u>PROPOSITION 57</u>

Diaz was 14 years old at the time he committed the charged offenses.  As permitted by the law in effect at the time he committed the crimes, the charges against him were directly filed in criminal (adult) court.  On November 8, 2016, after Diaz had been convicted and sentenced but while his appeal was pending, voters enacted Proposition 57.  It went into effect the next day.  (Cal. Const., art. II, § 10, subd. (a).)  Insofar as we are concerned, Proposition 57 eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court.  It replaced the provisions permitting such direct filing with a procedure by which the prosecuting attorney can move to have the minor transferred from juvenile court to a court of criminal jurisdiction.  It also removed the presumption of unfitness that attached to the alleged commission of certain offenses, including murder.  (See generally Welf. & Inst. Code, §§ 602, 707, subds. (a) & (b).)

Diaz claims that because his case was not yet final at the time voters approved Proposition 57, he is entitled to have his convictions and sentence vacated, and to have his case remanded to the juvenile court for a transfer hearing.  The California Supreme Court recently agreed.  (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303-304

---

[*]     See footnote, *ante*, page 1.

(*Lara*).)[63]  Accordingly, we will conditionally reverse Diaz's convictions and sentence, and order the juvenile court to conduct a juvenile transfer hearing (Welf. & Inst. Code, § 707), as more fully set out in our disposition, *post*.  Diaz is not entitled to a jurisdictional hearing, or the equivalent of a second trial, in juvenile court, however. (*Lara*, *supra*, 4 Cal.5th at pp. 309-310.)

## VI[*]

### SENTENCING ISSUES

Pantoja was sentenced, on count II, to the middle term of two years six months. On count I, the court imposed a consecutive term of 25 years to life in prison.  Diaz was sentenced, on count II, to two years six months plus 25 years to life for the firearm enhancement.  On count I, the court imposed an additional consecutive sentence of 25 years to life.  Both defendants were ordered to pay various fees, fines, and assessments, as well as victim restitution in the amount of $8,129.59.

## A.    The Firearm Enhancement

Diaz makes several claims with respect to the firearm enhancement imposed in conjunction with count II.  We conclude that, whatever the outcome of his juvenile transfer hearing, he is entitled to have the court exercise its new discretion whether to strike the enhancement, but he is not entitled to have us vacate or strike it, or bar its reimposition.

### 1.    Background

With respect to count II, the information alleged, as to defendants and J.P., "that defendant, was a principal in the foregoing offense, and that the defendant violated subdivision (b) of Penal Code section 186.22, and that at least one of the principals in the

---

**63**    Because the opinion in *Lara* was filed after briefing in the present case was completed, we advised the parties of our tentative conclusion in this regard, and afforded them the opportunity to address it and/or the appropriate disposition.

\*    See footnote, *ante*, page 1.

offense, personally and intentionally discharged a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death to any person other than an accomplice, to wit, **CHAZ BETTENCOURT**, within the meaning of section 12022.53(d) and (e)(1) of the California Penal Code."  Count II of the information also contained the following enhancement allegation, again as to defendants and J.P.:  "It is further alleged pursuant to Penal Code Section 186.22(b)(1) that the above offense was committed for the benefit of or in association with a criminal street gang, to wit, **NORTEÑO**, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

Insofar as is pertinent here, the trial court instructed the juries:

> "If you find the defendant guilty of attempted carjacking, you must then decide whether the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang.

> "You must decide whether the People have proved this allegation for each crime and return a separate verdict for each crime.  To prove this allegation, the People must prove that:  One, the defendant committed or attempted to commit the crime for the benefit of, at the direction of or in association with a criminal street gang; and, two, the defendant committed or attempted to commit the crime with the specific intent to promote, further or assist criminal conduct . . . by gang members.  [¶] . . . [¶]

> "If you find the defendant guilty of attempted carjacking and find that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members, you must then decide whether the People have proved the additional allegation that one of the principals personally and intentionally discharged a firearm during that crime.

> "To prove this allegation, the People must prove that someone who was a principal in the attempted carjacking personally discharged a firearm during the attempted carjacking causing death.

"A person is a principal in a crime if he or she directly commits or attempts to commit a crime or if he or she aids and abets someone else who commits or attempts to commit a crime."

In pertinent part, the jury's verdict for Diaz on count II read, with "was" or "was not" handwritten in the blanks:

"We further find that pursuant to Penal Code Section 186.22(b)(1) that the above offense was not committed for the benefit of or in association with a criminal street gang, to wit, NORTENO, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

"We further find that defendant was a principal in the attempted carjacking, and that the defendant violated subdivision (b) of Penal Code section 186.22, and that at least one of the principals in the offense, personally and intentionally discharged a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death to any person other than an accomplice, to wit, CHAZ BETTENCOURT, within the meaning of section 12022.53(d) and (e)(1) of the California Penal Code."

At sentencing, Diaz argued that, in light of the jury's not true finding on the section 186.22, subdivision (b) enhancement allegation, the section 12022.53, subdivision (e)(1) enhancement should not apply as it was dependent upon a true finding under section 186.22, subdivision (b).[64] The prosecutor disagreed, arguing inconsistent verdicts were valid; hence, the jury's finding of the firearm discharge pursuant to section 12022.53, subdivisions (d) and (e)(1) should stand. The trial court responded: "Subdivision D doesn't require the 186.22. [¶] . . . [¶] . . . So I think that's sufficient authority." The court then imposed a sentence of, inter alia, 25 years to life "for the enhancement under 12022.53(d)."

---

[64] On appeal, Diaz claims defense counsel objected to imposition of an enhancement under subdivisions (d) and (e)(1) of section 12022.53. In reality, counsel stated: "Your Honor, . . . I would argue that in light of the 186.22(b), not true finding by the jury, that the 12022.53(e) enhancement should not apply, which is dependent upon a true finding under 186.22(b)." Counsel did not object to imposition of an enhancement under section 12022.53, subdivision (d).

83.

2.      Imposition of Firearm Discharge Enhancement

Diaz makes two claims concerning the trial court's imposition of an enhancement pursuant to section 12022.53, subdivision (d).  First, he says we must vacate the enhancement, under federal due process and subdivision (j) of section 12022.53, because the information failed to allege Diaz personally discharged a firearm.  Second, he says we must strike the jury's true finding under section 12022.53, subdivisions (d) and (e)(1), and bar imposition of the enhancement, because the jury found the section 186.22, subdivision (b)(1) gang enhancement not true, and that enhancement is an essential element of section 12022.53, subdivision (e)(1).  Because of the factual and legal overlap of these two claims, we address them together.

We conclude Diaz's sentence on count II could not be enhanced pursuant solely to subdivision (d) of section 12022.53.  The information never alleged, the trial court did not instruct jurors on the need to find, and jurors never found, Diaz *personally* discharged a firearm.

Subdivision (d) of section 12022.53 requires that, in order for a sentence to be enhanced by a consecutive term of 25 years to life in prison under that subdivision, the person must have "*personally* and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury . . . or death . . . ."  (Italics added.)  Thus, a defendant's *personal* discharge of a firearm is a fact required under subdivision (d) of section 12022.53.  Subdivision (j) of the statute states, in pertinent part:  "For the penalties in this section to apply, the existence of any fact required under subdivision . . . (d) *shall be alleged in the accusatory pleading* and either admitted by the defendant in open court or *found to be true by the trier of fact*."  (Italics added.)

Whether Diaz personally discharged a firearm was for the trier of fact — in this case, the jury — to decide.  (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1007.)  Imposition of the enhancement under subdivision (d) of section 12022.53, when the jury made no such finding, resulted in an unauthorized sentence that required no objection to

84.

preserve for appeal. (*People v. Mancebo* (2002) 27 Cal.4th 735, 749-750, fn. 7; see *People v. Scott* (1994) 9 Cal.4th 331, 354; cf. *People v. Houston* (2012) 54 Cal.4th 1186, 1225-1229.)

The pleading requirements of section 12022.53, subdivision (j), and Diaz's due process rights, were violated because he was never afforded notice that section 12022.53, subdivision (d) would apply to his case even if the jury rejected the section 186.22, subdivision (b) allegation. Sentencing error then occurred when the trial court imposed an enhancement under subdivision (d) of section 12022.53, without the jury having made the requisite finding of personal discharge. (See *People v. Mancebo*, *supra*, 27 Cal.4th at p. 753.) A harmless-error analysis does not apply. (See *id*. at pp. 752, 754; *People v. Perez* (2015) 240 Cal.App.4th 1218, 1225; *People v. Botello* (2010) 183 Cal.App.4th 1014, 1021-1022, 1026-1029.)

In light of the foregoing, Diaz's sentence cannot be enhanced pursuant to section 12022.53, subdivision (d). This does not mean, however, that his sentence cannot be enhanced by a consecutive term of 25 years to life.

Section 12022.53, subdivision (e)(1) permits vicarious liability — liability without the need for a finding by the trier of fact that the defendant *personally* discharged a firearm — by applying the enhancement contained in section 12022.53, subdivision (d) "to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22 [and] [¶] (B) Any principal in the offense committed any act specified in subdivision . . . (d)."

As previously described, Diaz's jury found the gang enhancement not true. By the wording of its verdict concerning the firearm enhancement, however, the jury *expressly* found Diaz was a principal in the attempted carjacking, "violated subdivision (b) of Penal Code section 186.22," and at least one of the principals in the offense personally and intentionally discharged a firearm, proximately causing great bodily injury or death "within the meaning of section 12022.53(d) and (e)(1) of the California Penal Code."

85.

If the wording of the verdict with respect to the firearm enhancement had not included an express finding of a violation of section 186.22, subdivision (b), we might agree with Diaz that imposition of the enhancement was barred. The reasoning would be that because jurors found the section 186.22, subdivision (b) enhancement allegation not true, they necessarily found an essential element of the firearm enhancement not proven beyond a reasonable doubt. (See *In re Johnston* (1935) 3 Cal.2d 32, 36; *People v. Hamilton* (1978) 80 Cal.App.3d 124, 130, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 484, 490, fn. 12.)[65]

Here, however, the verdict unequivocally shows the jury found Diaz violated section 186.22, subdivision (b) with respect to the firearm enhancement. (See *People v. Chevalier* (1997) 60 Cal.App.4th 507, 514.) A criminal defendant is entitled "to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' [Citations.]" (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 477 (*Apprendi*).) Based on the express language of the jury's finding on the firearm enhancement, Diaz received the requisite jury determination, beyond a reasonable doubt, of every element of the enhancement alleged under section 12022.53, subdivisions (d) and (e)(1). Accordingly, the issue is not one of failure to prove an essential element, but rather one of inconsistent verdicts (findings) on the enhancements.

In part, section 954 provides: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." Accordingly, "[a]s a general rule, inherently

---

[65] The rule has been stated thus: "[W]here all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty," the guilty verdict cannot stand. (*People v. Hamilton*, *supra*, 80 Cal.App.3d at p. 130.) We need not decide whether this rule should, or does, extend only to conspiracy cases in which the defendant is convicted of conspiracy, but acquitted of the crime alleged as the only overt act in furtherance thereof. (See *People v. Guerrero* (1943) 22 Cal.2d 183, 187-189; *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657-1659.)

86.

inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 600; accord, *United States v. Powell* (1984) 469 U.S. 57, 66-67; *People v. Santamaria* (1994) 8 Cal.4th 903, 911.) This rule applies equally to inconsistent enhancement findings. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405.) "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (*Dunn v. United States* (1932) 284 U.S. 390, 394, overruled on another ground in *United States v. Powell*, *supra*, 469 U.S. at p. 64.)

" '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' [Citation.]" (*People v. Lewis*, *supra*, 25 Cal.4th at p. 656, quoting *United States v. Powell*, *supra*, 469 U.S. at p. 67.)

There was sufficient evidence to support the gang enhancement in the present case.[66] Accordingly, while Diaz's sentence on count II cannot be enhanced pursuant to

---

[66]    We are not required to eliminate from our consideration in this regard evidence that may have been improperly admitted. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 39-40.)

87.

section 12022.53, subdivision *(d)*, it is subject to enhancement pursuant to subdivisions (d) *and (e)(1)* of that statute. We will order the judgment modified accordingly.[67]

3.      Senate Bill No. 620

At the time Diaz was charged, convicted, and sentenced, subdivision (h) of section 12022.53 provided: "Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section." Thus, the trial court was required to enhance Diaz's sentence on count II by 25 years to life, pursuant to section 12022.53.

After Diaz was sentenced, the Legislature enacted Senate Bill No. 620 (Stats. 2017, ch. 682, § 2). As of January 1, 2018, subdivision (h) of section 12022.53 provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

Relying primarily on *People v. Francis* (1969) 71 Cal.2d 66, 75-76, the Attorney General concedes the foregoing amendment applies retroactively to Diaz's case, which was not yet final when the amendment went into effect (see *People v. Vieira* (2005) 35 Cal.4th 264, 306). We accept the concession without further analysis. Diaz is entitled to have the juvenile or trial court (depending upon the outcome of the juvenile transfer hearing) exercise its new discretion whether to impose the section 12022.53 enhancement on Diaz with respect to count II.

---

[67]     In our disposition, we will modify the judgment with respect to this enhancement *before* conditionally reversing pursuant to *Lara*, *supra*, 4 Cal.5th 299. We do so because, as previously stated, Diaz will not be receiving the equivalent of a second trial. Therefore, the statutes Diaz violated need to be correct, regardless of whether his offenses ultimately are deemed to be juvenile adjudications or are reinstated as criminal convictions and enhancements.

**B.** **Cruel and Unusual Punishment**

Diaz contends his sentence amounts to a de facto term of life in prison without the possibility of parole (LWOP), and violates the Eighth Amendment's prohibition against cruel and unusual punishment, because (1) the trial court refused to consider mitigating circumstances attendant to Diaz's youth before imposing that term, and (2) the jury did not find, beyond a reasonable doubt, that Diaz is permanently incorrigible, a fact necessary to increase a juvenile's sentence to LWOP or de facto LWOP.[68] We conclude, consistently with *Franklin*, *supra*, 63 Cal.4th 261, that sections 3051 and 4801, subdivision (c) have mooted any constitutional claims. We also conclude, however, that Diaz should receive a limited remand to afford him an adequate opportunity to make a record of information that will be relevant to the parole authority as it fulfills its statutory obligations under those statutes.

In *Graham v. Florida* (2010) 560 U.S. 48, 52-53, 74-75 (*Graham*), the United States Supreme Court banned imposition of outright LWOP sentences on juveniles convicted of nonhomicide offenses. In *Miller v. Alabama* (2012) 567 U.S. 460, 479 (*Miller*), the high court outlawed, as violative of the Eighth Amendment, mandatory LWOP for juveniles convicted of murder. The court explained: "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." (*Miller v. Alabama*, *supra*, at p. 479.) In *People v. Caballero* (2012) 55 Cal.4th 262, 265, 268, the California Supreme Court held that the proscription in *Graham* against LWOP for nonhomicide offenses applies equally to sentences that are the functional equivalent of LWOP.

---

[68] We assume, solely for purposes of our discussion of these issues, that Diaz's case will remain in criminal (adult) court following the juvenile transfer hearing and the trial court will again impose the section 12022.53 enhancement on count II, making Diaz subject to an aggregate term of two years six months plus 50 years to life. We further assume a sentence of that length constitutes a de facto sentence of LWOP. (See *People v. Contreras* (Feb. 26, 2018, S224564) ___ Cal.5th ___, ___ [2018 Cal. LEXIS 1008, *2].)

In *Franklin*, *supra*, 63 Cal.4th at page 276, the California Supreme Court held that "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences. . . . Because sentences that are the functional equivalent of LWOP implicate *Graham*'s reasoning [citation], and because ' "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile" ' whether for a homicide or nonhomicide offense [citation], a sentence that is the functional equivalent of LWOP under *Caballero* is subject to the strictures of *Miller* just as it is subject to the rule of *Graham*."

Diaz's sentence, as imposed, is saved from unconstitutionality, under the Eighth Amendment to the United States Constitution, by sections 3051 and 4801, subdivision (c). Stripped of all nonessentials, subdivision (b)(3) of section 3051 makes Diaz eligible for parole in his 25th year of incarceration, while subdivision (c) of section 4801 requires the Board of Parole Hearings to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner" in determining Diaz's suitability for parole. This being the case, Diaz no longer is subject to a de facto LWOP sentence, because he is clearly provided with a meaningful opportunity to obtain release within his expected lifetime. (*Franklin*, *supra*, 63 Cal.4th at pp. 279-280.)[69] Because he is no longer subject to a de facto LWOP sentence, his claim that, pursuant to *Apprendi*, the Sixth Amendment requires a jury to find permanent incorrigibility beyond a reasonable doubt (see *Montgomery v. Louisiana* (2016) 577 U.S. ___, ___ [136 S.Ct. 718, 734]), founders at the outset.

We recognize that the passage of time may hinder Diaz's ability to find and produce favorable evidence bearing on parole. In *Franklin*, the California Supreme Court

---

[69]   It does not appear Diaz is subject to any of the exclusions from a youthful offender parole hearing set out in subdivision (h) of section 3051.

stated: "In directing the [parole authority] to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner' [citation], the statutes . . . contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the [parole authority]'s consideration. For example, section 3051, subdivision (f)(2) provides that '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime . . . may submit statements for review by the [parole authority].' Assembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away. [Citation.] In addition, section 3051, subdivision (f)(1) provides that any 'psychological evaluations and risk assessment instruments' used by the [parole authority] in assessing growth and maturity 'shall take into consideration . . . any subsequent growth and increased maturity of the individual.' Consideration of 'subsequent growth and increased maturity' implies the availability of information about the offender when he was a juvenile. [Citation.]" (*Franklin*, *supra*, 63 Cal.4th at pp. 283-284.)

Diaz was not permitted to present such evidence at his sentencing hearing. (Cf. *People v. Palafox* (2014) 231 Cal.App.4th 68, 75-78.) We do not fault the trial court; a defendant is not entitled to unlimited time and continuances between conviction and imposition of sentence. Diaz was convicted on October 28, 2013, his new trial motion was heard and denied on February 10, 2015, and sentencing took place on March 23, 2015. At sentencing, Diaz's counsel requested "at least" a month's continuance to assemble and present such evidence. The prosecutor vehemently objected, noting the length of time the matter had been pending sentencing. The trial court observed defense

91.

counsel had not mentioned the issue when sentencing was set at the time the new trial motion was denied, and found it unfair to the victims to put off sentencing any longer. When counsel objected under *Miller*, the court said it was familiar with the case.[70]

Nevertheless, the focus of the sentencing hearing was the length of the sentence, not a future youth offender parole hearing. Accordingly, and because some of the information relevant to such a hearing may also be relevant to the trial court's decision whether to strike the firearm enhancement, Diaz should be afforded, upon remand, an adequate opportunity to make a record of information that will be relevant to the parole authority as it fulfills its statutory obligations under sections 3051 and 4801, subdivision (c). (See *Franklin*, *supra*, 63 Cal.4th at p. 284.)

## C.    Clerical Errors in the Abstracts of Judgment

Defendants contend, and the Attorney General concedes, their abstracts of judgment must be corrected as follows: (1) Liability for victim restitution must be shown to be joint and several; and (2) Conviction on count II must be shown to have been by jury.

## DISPOSITION

As to Diaz, the judgment is modified to provide that sentence on count II is enhanced by a consecutive term of 25 years to life in prison pursuant to Penal Code section 12022.53, subdivisions (d) and (e)(1). As so modified, the convictions and sentence are conditionally reversed and remanded to the juvenile court with directions to conduct a juvenile transfer hearing. (Welf. & Inst. Code, § 707.) When conducting said hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Diaz's cause to a court of criminal (adult) jurisdiction. (*Id*., subd. (a)(1).)

---

[70]    Although the reporter's transcript reflects the trial court said it was "unfamiliar" with the case, we believe this to be a transcription error in light of the court's reference to having dealt previously with the issue.

If, after conducting the juvenile transfer hearing, the juvenile court finds it would *not* have transferred Diaz to a court of criminal (adult) jurisdiction, it shall treat Diaz's convictions as juvenile adjudications; exercise its discretion under Penal Code section 12022.53, subdivision (h), as amended by Senate Bill No. 620 (Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018); and impose an appropriate disposition within its discretion.

If, after conducting the juvenile transfer hearing, the court determines it would have transferred Diaz to a court of criminal (adult) jurisdiction because he is not a fit and proper subject to be dealt with under the juvenile court law, then Diaz's convictions and sentence shall be reinstated. (Welf. & Inst. Code, § 707.1, subd. (a).) The trial court shall (1) afford Diaz an adequate opportunity to make a record of information that will be relevant to the parole authority as it fulfills its statutory obligations under Penal Code sections 3051 and 4801, subdivision (c); and (2) exercise its discretion under Penal Code section 12022.53, subdivision (h), as amended by Senate Bill No. 620 (Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018), and, if appropriate following exercise of that discretion, to resentence Diaz on count II accordingly. The trial court shall cause to be prepared an amended abstract of judgment that reflects (1) the foregoing modification or resentencing, (2) that liability for victim restitution is joint and several, and (3) that conviction on count II was by jury; and shall cause a certified copy of same to be transmitted to the appropriate authorities.

As to Pantoja, the judgment is affirmed in its entirety. The trial court shall cause to be prepared an amended abstract of judgment that reflects that liability for victim restitution is joint and several, and that conviction on count II was by jury, and shall cause a certified copy thereof to be transmitted to the appropriate authorities.

_____
DETJEN, J.

WE CONCUR:

_____
POOCHIGIAN, Acting P.J.

_____
PEÑA, J.

94.